**WOOLRICH WOOLEN MILLS,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

Civ. A. No. 5138.

United States District Court
M. D. Pennsylvania.

Dec. 4, 1959.

William J. Madden, Jr., Harrisburg, Pa., for plaintiff.

Charles K. Rice, Asst. Atty. Gen., James P. Garland, Lyle M. Turner, George Elias, Jr., Attys., Dept. of Justice, Washington, D. C., Daniel H. Jenkins, U. S. Atty., Scranton, Pa., for defendant.

FOLLMER, District Judge.

This action was tried to the Court without a jury. The Court having considered the pleadings, stipulations, evidence adduced at the trial, the arguments and briefs of the parties, and being fully advised in the premises, now finds the facts herein and states its conclusions of law as follows:

Findings of Fact

1. Plaintiff is a corporation organized on January 6, 1830, and existing under the laws of the Commonwealth of Pennsylvania, and having its principal place of business at Woolrich, Clinton County, Pennsylvania.

2. Plaintiff has been at its present location since its organization in 1830 and has been continuously therein engaged in the manufacture of woolen goods. The manufacturing process results in the discharge of a large quantity of water containing dyes and short woolen fibers in suspension which waste was piped directly into Chatham Run, a small public stream located in Pine Creek Township, Clinton County, Pennsylvania, which eventually empties about 2 miles down stream into the West Branch of the Susquehanna River, and a point approximate 2½ miles west of Avis, and then 70 miles more or less southward, where it flows into the main stream of the Susquehanna River at Northumberland, Pennsylvania. At all times prior to 1950 plaintiff's woolen mill was operated without a waste disposal plant.

3. By the Act of May 8, 1945, P.L. 435, 35 P.S. § 691.307 et seq., the Legislature of the Commonwealth of Pennsylvania enlarged by amendment the scope and tightened the enforcement machinery of its antipollution laws. The title to this amending act provides in pertinent part as follows, to wit:

" * * * by changing and adding penalties for violations and requiring certain prosecutions to be instituted or approved by the Attorney General; by prohibiting the discharge of silt into any waters of the Commonwealth and regulating the discharge of acid mine drainage into waters thereof; authorizing the Sanitary Water Board to establish standards of purity and to determine the time for compliance with the provisions of the act in certain cases; and requiring the board's approval of plans of drainage and disposal of industrial waste and acid mine drainage before opening, reopening, or continuing the operation of coal mines and the changing of approved plans by authorizing the acquisition, by purchase or condemnation, or otherwise, by the Sanitary Water Board of easements or right of ways, and the acquisition or construction of pipes, conduits, drains, or tunnels and pumps, and pumping equipment; and providing for the payment of the costs thereof by the Commonwealth."

4. On September 28, 1945, the Sanitary Water Board of the Department of Health of the Commonwealth of Pennsylvania, by letter bearing that date, directed the plaintiff to discontinue all discharge of water from its mill into public streams on or before June 1, 1946, or by that date to submit satisfactory plans for treatment of the water so as to eliminate the pollution elements therefrom. Thereupon plaintiff began consultation with various state officials and with engineers of the Sanitary Water Board for the purpose of complying with the Board's directions and plaintiff started to make plans to install the waste disposal plant.

5. On November 26, 1948, plaintiff entered into a written contract with Warren H. Ohl, a registered engineer and contractor, to build a waste disposal plant. Under this contract, plaintiff was to advance money to Ohl "for the purchase of labor, services, supplies, and equipment for the fulfillment of the contract." Ohl was to receive one per cent of the total cost of the plant for his services.

6. Pursuant to the contract between Warren Ohl and plaintiff deposits were made by plaintiff to the account of War-

ren Ohl, contractor, in the following amounts and on the dates indicated,

| Date | Amount |
|------|--------|
| November 16, 1950 | $50,000.00 |
| April 7, 1951 | 50,000.00 |
| December 27, 1951 | 8,670.64 |

7. The Commonwealth approved certain plans of the plaintiff for the construction of a waste disposal plant and issued to plaintiff an Industrial Wastes Permit No. 1346, on August 16, 1950. During that year plaintiff entered into a written contract with the Lundy Construction Co., Inc., of Williamsport, Pennsylvania, for the erection of a Filtration Plant. The total contract amount was $106,727 with a few extra items making up a total of $108,159.02 taken as a deduction by the plaintiff in computing its taxable net income for the calendar year 1950, which was disallowed by the Commissioner of Internal Revenue, and resulted in the deficiency of income tax for that year which plaintiff seeks to recover in this action. This contract which was introduced into evidence and marked as Exhibit 5, showing as the parties thereto Warren H. Ohl of the one part and Lundy Construction Co., Inc., of Williamsport, Pennsylvania, as party of the other part, was in reality a contract between Woolrich Woolen Mills and Lundy Construction Co., Inc. The said Warren H. Ohl in entering into the said contract did so as the agent of the said Woolrich Woolen Mills.

8. In accordance with the terms of the contract for construction of the plant with Lundy Construction Co., Inc., the following charges were made against plaintiff and payments received thereon during the following years:

| Year | Charges | Payments |
|------|---------|----------|
| 1950 | $12,924.00 | $8,500.00 |
| 1951 | 94,331.76 | 82,618.00 |
| 1952 | | 16,137.76 |
| | $107,255.76 | $107,255.76 |

9. The purification plant is located approximately one-third of a mile from plaintiff's mill. It consists of one building enclosing a large revolving wheel covered with wire mesh. The water discharged from the plant is piped to the wheel and must flow through the wire mesh to reach a series of open settling tanks. The first of these is the sedimentation tank with a capacity of approximately 58,000 gallons. It is then introduced into the rotating circular filter, a tank filled with small rocks. From the circulating filter the waste water is passed to the final settling tank of approximately 117,000 gallons capacity; and from these discharged into Chatham Run. The circular filter is the only tank which contains rocks. During the process of purification the water is treated by the addition of chemicals. It is intended that by forcing the water through the wire mesh and through the stones the wool lint will adhere thereto and be eliminated from the water. However, it has been found that the lint in a very short time clogs the mesh screen and adheres to the stones so that the procedure does not have the desired effect. Despite the adoption of certain but not all suggestions made by the engineers of the Commonwealth and of private engineers, the system has not worked satisfactorily. It has been in operation less than one-fourth of the time since it was completed in 1952. When the system is not in operation, it is by-passed and the water is discharged, as formerly, directly into Chatham Run with the knowledge and permission of the Sanitary Water Board of the Commonwealth of Pennsylvania. Plaintiff has attempted in good faith to make the plant work and has spent money in addition to that here involved.

10. The plant was erected by plaintiff solely for the purpose of preventing the Commonwealth of Pennsylvania from enjoining, pursuant to Pamphlet Law 435, supra, by Court Order the discharge of water in Chatham Run, which injunction would have completely halted operation of plaintiff's manufacturing process.

11. The waste plant is a permanent addition to the plaintiff's mill property constructed in compliance with the order

of the Sanitary Water Board of the Commonwealth of Pennsylvania, having a life extending beyond the year in which construction thereon was completed.

12. Construction of the plant was begun in 1950 and was not completed until May, 1952.

13. On April 8, 1954, plaintiff filed a claim for refund for the deficiency in tax sought to be recovered in this action. On October 14, 1954, plaintiff was notified by registered mail that its claim for refund had been rejected in its entirety.

14. Plaintiff keeps its books and records and files its income tax returns on a calendar year basis and on the accrual basis of accounting.

15. On or about March 15, 1951, plaintiff filed its corporation income tax return for the calendar year 1950 with the Collector of Internal Revenue for the Twelfth District of Pennsylvania, at Scranton, Pennsylvania, which disclosed an income tax liability of $112,099.57 which was paid in installments as follows: On March 19, 1951, the sum of $33,629.87; on June 26, 1951, $33,629.-87; on September 24, 1951, $22,419.22; and on December 19, 1951, the sum of $22,419.99.

16. After investigation and audit of plaintiff's income tax return for the calendar year 1950, the Commissioner of Internal Revenue disallowed as a business expense deduction the sum of $108,159.02 taken on plaintiff's income tax return for that year in computing its taxable net income, and made other adjustments not involved herein, which resulted in the determination of a deficiency in income tax for that year in the amount of $43,623.-95. On March 23, 1954, plaintiff paid to the aforesaid Collector of Internal Revenue the sum of $51,504.94 in discharge of aforesaid deficiency in tax in the amount of $43,623.95 and interest thereon in the amount of $7,880.99, and on March 26, 1954, plaintiff paid additional interest on said deficiency in the amount of $28.69.

Discussion

The questions presented here have, I think, been correctly stated by the Government as follows:

"1. Whether the cost of a waste disposal plant, constructed in compliance with an order of the Sanitary Water Board of the Commonwealth of Pennsylvania directing the taxpayer to discontinue discharging silt and other industrial wastes into a public stream, constitutes an ordinary and necessary business expense within the meaning of Section 23(a) (1) of the Internal Revenue Code of 1939 [26 U.S.C.A. § 23(a) (1)] or a capital expenditure.

"2. Whether, in the event that such cost is deemed to be an ordinary and necessary business expense, the taxpayer would be entitled to take such a deduction in 1950 where the waste disposal plant was not completed or paid for until 1952; or

"3. In the alternative, whether the taxpayer is entitled to deduct the cost of the waste disposal plant in 1950 as a business loss not compensated for by insurance or otherwise, under Section 23(f) of the Internal Revenue Code of 1939."

It is the contention of the taxpayer that the cost of the plant constitutes an ordinary and necessary business expense deductible in 1950, or in the alternative is a business loss not compensated for by insurance or otherwise. The Government, on the other hand, contends that the cost of the plant is a capital expenditure to be depreciated over the useful life of the asset.

The taxpayer is a manufacturer of woolen goods. Its operating facilities are, and have been, situated at Woolrich, Pennsylvania, since 1830. Prior to the year 1950, the taxpayer dumped its mill waste into Chatham Run, a small stream which eventually empties, about two miles down stream, into the West Branch of the Susquehanna River at a

point approximately 2½ miles west of Avis, Pennsylvania, and thence 70 miles, more or less, southward, where it flows into the main stream of the Susquehanna River at Northumberland, Pennsylvania.

In May 1945, the Legislature of the Commonwealth of Pennsylvania enlarged the scope and tightened the enforcement machinery of its antipollution laws by (1) prohibiting the discharge of silt into the Commonwealth waters, and (2) empowering the Sanitary Water Board (hereinafter called "Board") to establish standards of waste purity and to approve plans for waste disposal submitted by parties seeking to conform with the new laws. Penalties were added for violations and power was given to the Attorney General to institute or approve prosecutions for violation of the provisions of the antipollution laws.

Pursuant to this authority, the Board by letter dated September 28, 1945, ordered the taxpayer to discontinue all discharge of mill waste from its establishment into public streams on or before June 1, 1946, or by that date to submit to the Board plans for construction of a plant to eliminate the pollution elements from its waste waters. Taxpayer, obviously, had no alternative except to comply with the order of the Board or cease operations. Accordingly, the taxpayer engaged an industrial engineering firm (Chester Engineers of Pittsburgh) to design and submit to the Board a plan for a waste treatment plant which would eliminate the offending pollution. After approval of the plans by the Board on August 16, 1950, a construction contract was awarded to the Lundy Construction Co., Inc., of Williamsport, Pennsylvania, with construction to be supervised by Warren H. Ohl, an independent engineer employed by the taxpayer, to assure compliance with the Chester specifications and designs.

The problem involved here is clearly set forth in Russell Box Co. v. Commissioner of Internal Revenue, 1 Cir., 1953, 208 F.2d 452, 454, where the court stated, inter alia:

"Whether a given expense is an ordinary and necessary business expense deductible in full from gross income in the year incurred * * *, or whether it constitutes an amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate not so deductible * * *, is clearly a question of fact in the first instance for the Tax Court. And the question is often a difficult one for it is by no means always easy to draw the line between a capital outlay and one for current maintenance. * * *"

To support its contention that the expenditure involved in the instant case was capital in nature defendant cites a number of cases which I feel are clearly distinguishable. For instance, in Hotel Sulgrave, Inc. v. Commissioner, 21 T.C. 619, a sprinkler system was installed by taxpayer in order to comply with a municipal regulation. Failure to install the system would have resulted in the closing of the building. In holding that the cost of this improvement or betterment should be added to petitioner's capital investment in the building, the court stated:

"* * * It was an *improvement* or *betterment* having a life extending beyond the year in which it was made and which depreciates over a period of years. While it may not have increased the value of the hotel property or prolonged its useful life, the property became more valuable for use in the petitioner's business by reason of compliance with the city's order. * * *" (Emphasis supplied.)

So also in Trenton-New Brunswick Theatres Co. v. Commissioner, 1954 P-H T.C. Memorandum Decisions, par. 54,175, a fire exit situation.

In the instant case, plaintiff has been continuously engaged in the manufacture of woolen goods since its organization in 1830. The filtration system,

the construction of which is the cause of the expenditure here involved, is completely divorced from the operation of plaintiff's business. Its construction did not improve, better, extend, increase, or prolong the useful life of plaintiff's mill property.

The facts here, in my opinion, fit perfectly in the pattern enunciated in Heininger v. Commissioner of Internal Revenue, 7 Cir., 1943, 133 F.2d 567, at page 569, where the court stated:

"We think that where an expense is incurred which saves the life of a business, even for a time, it is, * * * not only a business expense, but a necessary business expense. Without the expenditure, there would have been no income in this case because there would have been no business. The business depended directly upon the expense incurred in the litigation. We therefore hold that the expense was both ordinary and necessary."

The court stated further (at page 570):

"If the deduction in the case at bar was not an ordinary and necessary expense to the 'carrying on' of the business, we are unable to understand the English language. Without this expense, there would have been no business. Without the business, there would have been no income. Without the income, there would have been no tax. To say that this expense is not ordinary and necessary is to say that that which gives life is not ordinary and necessary."

I conclude that the cost of the filtration plant is an ordinary and necessary business expense deductible in full from gross income in the year incurred.

The Government contends that should the Court decide that the expenditures were deductible business expenses, the taxpayer is entitled to deduct only the amount of $12,924 for the year 1950, which, it contends, is the amount for which taxpayer became liable for that year. They argue further that the terms of the contract called for a payment of $106,727 ($108,159.02 is the amount actually expended and which the taxpayer claims it is entitled to deduct) for the performance of the contract; that Article III provides for monthly partial payments on the basis of 85% of the work completed and materials used; that before the builder, Lundy, was entitled to the full amount of the payment, however, Ohl, as agent for taxpayer, was required to issue a certificate of acceptance and until such time as the certificate was issued, the builder was not entitled to the balance nor was the taxpayer liable therefor; that, therefore, under the terms of the contract the builder was entitled, and the taxpayer was liable for only 85% of the value of the work completed and materials used until the certificate of acceptance was issued; that as noted in stipulations filed in the case, the charges against the taxpayer by Lundy for 1950 amounted to only $12,924, which pursuant to the terms of the contract presumably approximated 85% of the value of the work completed and materials used on the plant during that year.

On the contrary, plaintiff contends that in the year 1950 it bound itself to pay the total cost of construction of the filtration plant; that the work was commenced in that year; that when it was called upon to make payments under the contract depended entirely upon the speed with which contractor performed its part of the contract; that the contract called for one complete job and not a series of actions performed over a period of time, payment for which it obligated itself in the year 1950; that its liability was incurred in 1950 although the exact date of payment was not then fixed, accordingly, for the reason that it kept its books and records and filed its income tax returns on a calendar basis and on the accrual basis of accounting, the deduction was properly claimed for the year 1950.

The first question we are met with here is whether a liability has been created, if so, when and in what amount,

as a nonexistent liability cannot be accrued.[1]

"It is essential to the creating of liability that there be between the parties either an agreement fixing its amount or making the amount readily ascertainable, * * * *"[2] That essential ingredient is present in this case in the written contract which calls for the payment of a sum certain for work and material in the construction of the filtration plant. There is no genuine contingency as to legal liability.

The facts here bring the case within the principle of Continental Tie & Lumber Co. v. United States, 286 U.S. 290, 295, 52 S.Ct. 529, 76 L.Ed. 1111, which holds that income may not be deferred after the right matures, even though the ministerial act of computing the amount occurs in the subsequent year, and this although the administrative procedure to ascertain the amount to be paid is that of a public commission.[3]

The converse of the situation here is clearly seen in the following cases:

Lucas v. North Texas Lumber Company, 1930, 281 U.S. 11, 50 S.Ct. 184, 74 L.Ed. 668, where the unconditional liability of vendee for purchase price was not created in the year in which vendor claims, under accrual basis of accounting, to have income returned and tax computed.

United States v. Harmon, 10 Cir., 1953, 205 F.2d 919, which involved the uncertainty of income accruing from cost plus fixed fee contracts.

Irwin v. Commissioner of Internal Revenue, 3 Cir., 1956, 238 F.2d 874, which held that the claimed accrual was improper because it was extremely uncertain.

I conclude that here the taxpayer became obligated in 1950 under a firm written contract for the total cost of construction of the filtration plant, that there is no genuine contingency as to liability, that it having been established that taxpayer kept its books and records and filed its income tax returns on a calendar basis and on the accrual method of accounting, taxpayer is entitled to deduct for the year 1950 the total amount to which it became obligated under the contract.

An appropriate order may be submitted.

---

1. Mertens, Law of Federal Income Taxation, Vol. 2, § 12.61.

2. Mertens, Law of Federal Income Taxation, supra.

3. See also, Commissioner of Internal Revenue v. Dumari Textile Co., Inc., 2 Cir., 1944, 142 F.2d 897; Dally v. Commissioner of Internal Revenue, 9 Cir., 1955, 227 F.2d 724.