## The York Water Company, Petitioner, v. Commissioner of Internal Revenue, Respondent.

Docket No. 79832.   Filed September 20, 1961.

*Alfred J. McDowell, Esq.*, for the petitioner.
*Frederick A. Levy, Esq.*, for the respondent.

Mulroney, *Judge:* The respondent determined a deficiency in petitioner's 1956 corporate income tax of $87,778.30.

Petitioner incurred a liability of $185,427 in 1956 under an agreement with the Pennsylvania Department of Highways.  The issue for decision is whether said liability constituted an ordinary and necessary business expense deductible under section 162, I.R.C. 1954,[1] or an ordinary loss deductible under section 165.

### FINDINGS OF FACT.

Some of the facts have been stipulated and they are found accordingly.

Petitioner, the York Water Company, is a public utility corporation subject to the supervision of the Pennsylvania Public Utility

---

[1] All section references herein are to the Internal Revenue Code of 1954, as amended.

Commission. It filed a calendar year accrual basis corporation Federal income tax return for the year 1956 with the district director of internal revenue at Philadelphia, Pennsylvania. During the year in question it was engaged in operating a public water supply and distribution system and in the sale of water to residential, commercial, and industrial users in York, Pennsylvania, and vicinity. In connection with its business petitioner owns and maintains a tract of 1,008 acres for watershed and reservoir purposes. Immediately adjacent to and upstream from this tract is another tract of about 600 acres suitable for reservoir and watershed purposes. The use of the 600-acre tract for reservoir and watershed purposes would involve flooding of substantially all of such tract. Petitioner's management and consulting engineers consider such tract as the most suitable one for possible additional watershed and reservoir purposes, although it is not the only possible one within petitioner's franchise area.

In 1955 petitioner's consulting engineers estimated that there was a possibility that by 1965 petitioner would require additional water storage capacity. This estimate was based on information relating to years prior to 1955. The engineers recommended the 600-acre tract as a reservoir site to meet the projected need.

Beginning in 1955 there was a decline in water consumption and during the 4 years ending in 1956 the average decline in consumption was about 5 percent. In 1955 petitioner increased the efficiency of its facilities in several ways. It raised the height of an existing dam and instituted a program to recover filter wash water. These steps alone increased the storage capacity of its reservoir by about 25 percent or 250 million gallons, saved about 750,000 gallons of water a day, and increased petitioner's safe dry weather yield to about 19,500,000 gallons a day or about 133 percent of its average daily usage. It has been petitioner's experience that its customers charged on a flat rate basis use about twice as much water as customers whose consumption is metered. About 1955 petitioner began placing more customers on a metered basis and thereby effected a saving in water consumption.

In 1956 petitioner had no present plans to acquire the 600-acre tract but did recognize that at some indefinite time in the future it might become necessary. The Pennsylvania Department of Highways proposed to relocate an expressway on an alignment which would traverse the 600-acre tract. Petitioner requested the Commonwealth to change the alignment of the expressway to avoid the 600-acre tract. Negotiations were carried on between the two parties in 1955 and on January 30, 1956, petitioner and the Commonwealth entered into an agreement whereby petitioner was to pay the Commonwealth $185,427. This amount was one-half the estimated additional cost to the Commonwealth of changing the alignment of the expressway. It was to

be paid by petitioner as follows: $35,427 within 15 days after receiving notice from the Commonwealth that the contract for construction of the expressway had been let; $75,000 within 1 year of letting said contract; and $75,000 within 2 years of letting said contract.

Unless water consumption increased substantially after 1956 petitioner would have no need for additional storage capacity. Petitioner, because it was a public utility, was required by law to meet the water needs of its customers as they existed from time to time. The use of the 600-acre tract for reservoir and watershed purposes would involve the flooding of a large portion of it, including the area where the proposed expressway would have been constructed. Had the expressway been built as originally proposed and had the use of the 600-acre tract by petitioner become necessary, the expressway would have had to be raised or relocated. Petitioner has never taken title to the 600 acres, but as a public utility it has the power under Pennsylvania law to acquire property by eminent domain.

On its 1956 income tax return petitioner deducted $185,427 and explained it as "Loss incurred by payment of one-half State's cost of relocating proposed road." In the notice of deficiency respondent, among other things, disallowed this amount "because said amount constitutes a capital expenditure."

OPINION.

Petitioner argues that the amount in question was either a business expense under section 162 or a business loss under section 165 and therefore deductible in its 1956 return. Respondent argues on brief that it was neither, but that "petitioner incurred a capital expenditure which should be added to the cost of the land if acquired or deducted as a loss in the year the thought of acquisition is abandoned."

We need not comment on respondent's observation that the payment in question was a capital expenditure. Whether it is deductible depends on whether the outlay is within the sections granting a deduction for business expenses or business losses. Petitioner's argument that the expenditure does not fit the statutory definition of a nondeductible capital expenditure (sec. 263), the regulatory definition of a capital expenditure (sec. 1.263(a)–1(b), Income Tax Regs.), or even the ordinary concept of a capital expenditure, does not advance his cause. "The idea that everything which is not strictly a capital investment must be a deductible expense is unsound." *Connally Realty Co.*, 31 B.T.A. 349, affd. 81 F. 2d 221. Petitioner's burden was to establish that the item fits the statute granting a deduction for business expenses or business losses and if it does not, it cannot be deducted even though this might result in making the item what the *Connally* opinion called "a nondescript before the law."

The general manager of the petitioner testified:

We felt if we had waited and the road was constructed that possibly there might be an influx of industrial or residential developments which would increase the land value and make it too costly to be practical for our reservoir.

It also appears from the testimony that if the expressway had been constructed as originally planned, any future use of the tract by petitioner would mean it would have to pay for either relocation or elevation of the expressway. It thus appears that the liability in question was incurred to prevent an increase in the future cost of acquisition and use of the tract should it become necessary at some time in the future to acquire and use it in its business. Petitioner argues that it was an expenditure[2] "incurred in order to protect its business and maintain its ability to properly discharge the responsibilities [of] its franchise" and as such comes within the rule that expenditures to protect and promote the taxpayer's business are deductible. It cites *Alleghany Corporation*, 28 T.C. 298; *Charles J. Dinardo*, 22 T.C. 430; *Van Iderstine Company* v. *Commissioner*, 261 F. 2d 211, reversing a Memorandum Opinion of this Court; *Woolrich Woolen Mills* v. *United States*, 178 F. Supp. 875, revd. 289 F. 2d 444 (C.A. 3, 1961), and Rev. Rul. 60-261, 1960-2 C.B. 42, for its position. None are in point.

In the *Alleghany* case the taxpayer had a substantial proprietary interest in a bankrupt railroad. The original reorganization plan of the Interstate Commerce Commission would have rendered the taxpayer's interest worthless. It expended amounts in opposing the Commission's plan and in proposing other plans which would allocate value to its interest. We held that the amounts so expended were deductible because they were made to protect its business of investment in and management of corporate securities. In *Dinardo* a medical partnership made up the operating deficit of a hospital in which the members of the partnership practiced. We held that the partnership could deduct the amounts so expended because they protected the current income of the partnership and as such were ordinary and necessary business expenses. In *Van Iderstine* the Second Circuit held that amounts the taxpayer expended to be permitted to purchase waste fats were expended in the hope or expectation of securing trade and as such were deductible as expenditures to protect and promote the taxpayer's business. In *Woolrich* the taxpayer dumped waste into a small stream in the course of its manufacturing process. Local authorities required it construct facilities for treating the waste or cease operations. The court concluded that the expenditure of constructing the waste treatment facility was an expenditure of a sort which saved the life of the business and protected its income. (The Third Circuit reversed on the ground that the expenditure was capital

---

[2] Petitioner is on the accrual basis. It accrued the entire amount of its liability under the agreement with the Commonwealth in 1956. For convenience this liability will sometimes be referred to herein as an expenditure.

in nature.) In Rev. Rul. 60–261, *supra*, expenses incurred in invalidating a municipal ordinance which interfered with the operation of the taxpayer's business were held deductible because proximately related to a business asset, the use of which had been limited by the hindrance which the expenditure removed. And see *Cubbedge Snow*, 31 T.C. 585.

If a single thread runs through the many cases dealing with expenditures to protect business interests, and more particularly through the four decisions upon which petitioner relies, it is that the threatened harm or interference was reasonably imminent when the expense was incurred and therefore susceptible to judicial evaluation. Certainly such is not the case here. Two precedent conditions of major proportions must occur before there is a threat to petitioner's business against which the expenditure in question might protect it: The demand for water must increase enough to require additional facilities and petitioner must decide that it is in its best business interests after all to acquire the particular tract in question. Unless and until these things happen the expenditure can have no effect upon petitioner's business.

We can find nothing in the nature of petitioner's expenditure itself which protects petitioner's business because we can find no evidence of a present challenge to the existence of such business. Nor can we find that the income from its business was placed in jeopardy from which the expenditure of the amount in question could reasonably be expected to remove it. Nor is there anything inherent in the expenditure or the effect of it which would tend to promote or expand petitioner's business.

Petitioner's case is based on remote possibilities. Its general manager testified that its consulting engineers in 1955 "estimated that in the year 1965 there might be the possibility" that additional storage facilities would be necessary. He then went on to add that petitioner accepted the engineers' opinion that increased facilities would sometime be needed but had no estimate as to the date the new reservoir might have to be built. It also appears that the engineers' estimate predated petitioner's realization that things such as increasing the dam height (and thus the capacity of the reservoir), changing the rate base, recovering filter wash water, and decreased consumption had combined to increase substantially its present service potential, and thus postpone the time, if ever, when additional facilities might be necessary.

In any event, even if we could conclude that the amount in question came within the rule of the authorities petitioner relies on, we are not convinced that the expenditure was "necessary" within the meaning of section 162(a). An expense is necessary where it is "appropriate and helpful" in the development of a taxpayer's business. *Commissioner* v. *Heininger*, 320 U.S. 467. In this case we cannot assume that

the amount in question was necessary, cf. *Welch* v. *Helvering*, 290 U.S. 111. It is petitioner's burden to show that it was.

Petitioner's general manager's testimony that an increase in the value of the land along the proposed route of the expressway would make the land "too costly to be practical for our reservoir" is not sufficient to show that the expenditure was appropriate or helpful to petitioner to keep down the cost of the land without a showing that there was more than a "possibility" petitioner would acquire it at some indeterminate future time. In addition, the record shows that the 600-acre tract was not the only possible reservoir site. Petitioner's expenditure of $185,427 will never be appropriate, helpful, or necessary to petitioner's business if the land is never acquired by petitioner. On this record we hold that petitioner has failed to show that the liability in question was an ordinary and necessary business expense within the meaning of section 162.

This case is similar to *Kauai Terminal, Ltd.*, 36 B.T.A. 893. There the taxpayer, engaged in ship-to-shore transportation business, contributed $200,000 to the United States toward the building of a breakwater costing $880,000. In holding against taxpayer's contention that the contribution was deductible as an ordinary and necessary expense, we said:

The expenditure was one calculated to result in a long standing direct business advantage to the petitioner, the effect of which was not alone felt in the year when made but was to carry on indefinitely into the future. So far as the taxpayer was concerned, although it did not own the breakwater and had no tangible capital asset as a result of its expenditure, the benefit resulting from the expenditure was as desirable as if the breakwater had become its own (perhaps more so, since the Government was to carry the burden of maintenance) ; and this benefit was not only immediate but was to extend into the indefinite future. Under such circumstances, it can not reasonably be said that the amount was an ordinary and necessary expense to be deducted in a single year.

Similarly in the instant case the most that can be said for the expenditure is that it was designed to secure a long-term "business advantage" to petitioner either in preserving its utility or keeping the acquisition cost low, if sometime in the future it developed petitioner would have need for additional water storage facilities and should decide to use this tract.

Petitioner argues in the alternative that the amount in question is an ordinary loss under section 165. We can glean no theory under which petitioner advances this argument except its contention that this case is like *Seufert Bros. Co.* v. *Lucas*, 44 F. 2d 528, reversing 14 B.T.A. 1023. In *Seufert* the taxpayer owned and used in its business extensive orchards containing fruit trees and irrigation ditches. It learned that the Oregon Highway Commission proposed to run a road through its orchards in such a way that it would have

suffered considerable damage to its trees and irrigation system. Negotiation with the highway commission resulted in a change in the route of the road, but the taxpayer was required to pay $5,000 because the new route necessitated a higher bridge. We found as a fact that the change in location saved the taxpayer more than the amount it had expended, but we denied the taxpayer's claim that the amount spent was an ordinary and necessary business expense because we could not find that the expenses were "current and have some relation to the production of income." On appeal, the Ninth Circuit reversed our decision, explaining that the taxpayer was confronted with a situation "threatening serious and permanent damage to its property" and that in order to "minimize its injury" it had paid the amount in question. It went on to say that while it agreed that the amount was not a business expense it was an expenditure incurred in an effort to save property from destruction and as such was a loss. The case is distinguishable. We have indicated above that we can find no element of protection of petitioner's property from a threatened loss. Petitioner incurred the liability in question to prevent the future increase in the cost of acquisition and use of the tract in the event it should become necessary to purchase it. Such an expenditure is not a loss.

We hold petitioner has not shown that it is entitled to a deduction of the amount claimed in 1956 either as a business expense or as a loss.

Because there were other items of disallowance placed in issue on which no evidence has been introduced, a Rule 50 computation will be necessary.

Reviewed by the Court.

*Decision will be entered under Rule 50.*