*Decision will be entered under Rule 50.*

MAUREEN FITZSIMONS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 78732. Filed November 8, 1961.

*Bruce I. Hochman, Esq.*, for the petitioner.
*Michael P. McLeod, Esq.*, and *Douglas W. Argue, Esq.*, for the respondent.

FAY, *Judge:* The Commissioner determined deficiencies in the petitioner's income taxes of $40,766.73 for the taxable year 1954 and $38,510.13 for the taxable year 1955.

Some of the Commissioner's proposed adjustments were not contested in the petition. The sole issue for decision is whether payments of $50,000 in each of the years 1954 and 1955 are ordinary and necessary expenses or are capital expenditures.

### FINDINGS OF FACT.

Some of the facts are stipulated and are so found.

The petitioner is a motion picture actress known professionally as Maureen O'Hara. She filed her Federal income tax returns for the years 1954 and 1955 with the district director of internal revenue at Los Angeles, California.

In June 1954, William B. Duce, an attorney who acted as the business adviser to the petitioner, was approached by Florent Bailey, a petroleum engineer, who suggested that Duce consider participating in the acquisition of certain oil and gas rights from the then Government of Cuba. Duce went to Cuba and arranged for the acquisition of mineral rights in more than 1,600,000 hectares [1] of land. These rights, however, could be held only by Cuban citizens. Therefore, Duce arranged for the formation of three Cuban corporations, Petrolera Perla Negra De Cuba, S.A., Petrolera Margarita Antillana, S.A., and Petrolera Los Cayos, S.A. (hereinafter referred to as the Cuban Corporations) for the purpose of acquiring these rights. [2]

Sometime in 1954 the mineral rights, at this stage called denouncements, [3] were acquired by the Cuban Corporations under the following obligations:

1. To pay yearly in advance, a surface tax on the concession area of 10¢ per hectare (4¢ per acre) for the first 10 years, 20¢ per hectare (8¢ per acre) for the second ten years, and 40¢ per hectare (16¢ per acre) for the last ten years.

2. To relinquish to the State one-eighth of the concession area as a national reserve. The prescribed procedure is to divide the area into eight equal blocks; the concessionaire chooses the first block, the State the second block for the national reserve, and the remaining six revert to the concessionaire.

3. To retain, if the concessionaire so wishes, the above-mentioned national reserve block for his own exploitation. In that event, however, the yearly surface taxes on the entire concession area are increased to $5.00 per hectare ($2.00 per acre) during the first ten years, $10.00 per hectare ($4.00 per acre) during the second ten years, and $15.00 per hectare ($6.00 per acre) during the last ten years.

---

[1] A hectare equals 2.471 acres.

[a] Two other Cuban corporations were later formed which obtained some further mineral rights from the Cuban Government. The lands leased by the petitioner included some in which these two corporations had rights, and these two corporations were made parties to a lease to the petitioner by amendment. However, the distinction between the various Cuban corporations is immaterial to this case, so the term "Cuban Corporations" will be used to refer not only to the original three corporations but also to the five corporations after the final two were formed.

[3] A denouncement is an application to lease a certain parcel of ground for mineral development.

4. To pay a royalty at the well of 11% of the oil produced after deducting that utilized in operations. Of this royalty, 10% belong[s] to the State and 1% to the private landowner. These royalties are payable in cash or in kind at beneficiaries' option. If in cash, the value of the oil at the well is computed on the basis of world market prices for oil of comparative quality from which are deducted all costs from Cuban well to world markets. The 10% royalty to the State is reduced to 9% on all oil refined in Cuba.

5. To drill every five years from the inception of the concession on each area of 24,000 hectares (60,000 acres) one well to a depth of not less than 4,000 feet, unless oil in commercial quantities is struck at lesser depth. Drilling of the first well must start within two years from the date of publication of the concession in the Official Gazette. Commercial production is defined as a daily minimum during thirty consecutive days of 122.4 barrels of oil or 100 gallons of naphtha. Areas of less than 8,000 hectares (20,000 acres) whether belonging to the same or to different concessionaires, may be grouped for joint compliance with the above drilling obligation.

6. To pay $1.00 per hectare ($0.40 per acre) for the grant of an exploitation concession.

Also, in December 1954 Duce, acting on behalf of the Cuban Corporations, entered into a leasing agreement with two Canadian corporations whereby they were given an option to select 75 percent of the land in which rights had been acquired from the Cuban Government. They would hold the rights in this land subject to the obligations owing under the grant from the Cuban Government, as well as certain other obligations. In addition, the Canadian corporations were to expend considerable money in exploration, geophysical and otherwise, and to make the results of their explorations known to their lessors. These corporations were to have 9 months within which to select their land.

In view of this agreement, Duce advised the petitioner to acquire an interest in the rights which would remain after the Canadian corporations had made their selection, for he felt that all the rights would increase in value by reason of the exploration of the land.

On December 20, 1954, the petitioner acquired a lease from the Cuban Corporations under which she would have the right to select 250,000 hectaries of the land covered by the grants from the Cuban Government. The lease was to run for 2 years and for so long as exploration or drilling operations were being conducted and thereafter for so long as oil, gas, or other hydrocarbon substance was being produced in commercial quantities from the selected land.

The selection was to be exercised prior to December 20, 1955, unless the Canadian corporations failed to make their selection by December 15, 1955. In the latter event, the selection was to be made within 30 days after the lessors served a written notice to select.

The petitioner was required to commence drilling by June 20, 1957, unless the lessor had not obtained proper exploration title from the Cuban Government, in which event drilling was to commence within

6 months after the lessor gave written notice that such title had been issued. Drilling was to be prosecuted to a depth of 4,000 feet unless hydrocarbons were encountered at a lesser depth. In addition, within 2 years of the commencement of drilling the petitioner was to complete 40,000 feet of hole.

The only provisions for payment to the lessor are in paragraphs 4 and 7 of the lease of December 20, 1954, which are as follows:

4. Lessee agrees to pay unto Lessors as rental for the first year of the term of said lease the sum of 20 cents per hectare, that is, $50,000.00 payable in advance upon the execution hereof, the receipt of which is hereby acknowledged by Lessors. Lessee agrees to pay unto Lessors as rental for the second year of the term of said lease the further sum of 20 cents per hectare, that is, $50,000.00, payable on December 20, 1955. In this connection it is understood that all rentals herein contemplated shall be payable to one of Lessors, to-wit, Petrolera Perla Negra de Cuba, S.A., which company shall allocate the payment made herewith as well as any future rentals between the respective Lessors as their interests may appear, and any such payment by Lessee shall be construed as payment to all Lessors, and the receipt of Petrolera Perla Negra de Cuba, S.A. shall be the receipt of all Lessors, and upon any such payment so being made by Lessee she shall be released from all liability in connection therewith and for the distribution and disposition thereof.

In no event shall Lessee be required to pay rental hereunder in excess of that required in this paragraph, to-wit, for two years of the term of this lease, and any rental paid by Lessee in addition thereto shall be done solely under the permissive provisions hereof relating to delay or deferment in exploratory or drilling activities by Lessee after the solicitudes have been brought to exploration titles.

*    *    *    *    *    *    *

7. Lessee shall, within two years after the date on which she is required to commence her drilling operations hereunder, complete 40,000 foot of hole on the 250,000 hectares demised hereunder, including the first 4000 foot well required hereunder. Said 40,000 foot of hole may be by core hole drilling or actual well drilling in the discretion of Lessee. In the event exploration titles are received by Lessors but Lessee fails to commence such drilling operations within six months thereafter, or, if having commenced such operations, Lessee shall fail to complete said 40,000 foot of hole within two years [June 20, 1959, or later] after the date on which she is required to commence such drilling operations, then the obligation to pay rental hereunder shall again accrue against Lessee. In such event such rental shall be upon the basis of one-twelfth of 20 cents per hectare per year. Lessee, in her discretion, may pay such rental for a delay in her obligation either to commence or to complete her drilling operations hereunder, but in no event shall she have the right to pay delay rental in excess of a period of two years. No rentals of any kind after exploration titles are issued shall accrue against Lessee while she is conducting seismic work, core drilling, or physical work on the land.

The two payments of $50,000 payable with respect to the first 2 years of the lease were bonus payments given for the rights obtained under the lease and not delay rentals. The petitioner paid these sums when due and deducted them as ordinary and necessary ex-

penses on her Federal income tax return for each of the years 1954 and 1955. The Commissioner disallowed these deductions.

On November 1, 1955, a limited partnership known as Cal Cuba Enterprises (hereinafter referred to as Cal Cuba) was formed by the petitioner and Duce in which Duce was the general partner and the petitioner the limited partner. Shortly after the petitioner made her second $50,000 payment, the petitioner contributed her lease to the capital of the partnership. The capital of the partnership included much of the stock of the lessor Cuban Corporations.

Thereafter, a Delaware corporation, White Eagle International Oil Company, Inc. (hereinafter called White Eagle), was formed. Substantially all of Cal Cuba's stock in the Cuban Corporations, as well as the lease originally granted to the petitioner, was transferred to White Eagle in exchange for some of its capital stock. White Eagle ultimately owned all of the capital stock of the Cuban lessor corporations.

During 1956 Cal Cuba sold 330,000 shares of White Eagle stock for $515,747.50, reporting the gain therefrom as long-term capital gain. The petitioner's share of the gain from this transaction was reported by her as long-term capital gain in her Federal income tax return for 1956.

OPINION.

The petitioner claims that the two $50,000 "rental" payments are deductible either under section 162 of the Internal Revenue Code of 1954, relating to the deduction of expenses of a trade or business, or section 212 of the Code, relating to the deduction of sums paid in connection with income-producing property, on the grounds that they were payments of a delay rental and not a bonus. She further asserts that even if they are considered installment payments of a bonus they are still deductible under the cited sections in the year paid. The respondent, on the other hand, urges that the $50,000 payments are installment payments of a bonus and as such are not deductible when made under any provision of the Code.

The first question is whether the two $50,000 payments are delay rentals or installment payments of a bonus. Delay rentals have been described in *J. T. Sneed, Jr.*, 33 B.T.A. 478, 482, (1935), as being "in the nature of liquidated damages or penalties for failure to drill upon, or exploit, the properties." A bonus is a principal sum paid as consideration for a lease. *Burnet* v. *Harmel*, 287 U.S. 103 (1932). This Court has held payments under oil leases to be delay rentals in *J. T. Sneed, Jr., supra*, and *Continental Oil Co.*, 36 B.T.A. 693 (1937). Payments were held to be bonuses in *Alice G. K. Kleberg*, 43 B.T.A. 277 (1941). See and compare *James Lewis Caldwell McFaddin*,

2 T.C. 395 (1943), modified on another issue 148 F. 2d 570 (C.A. 5, 1945).

These cases discuss the characteristics of delay rentals and bonuses and demonstrate that the question whether a payment is a delay rental or bonus is one of fact. The fact that the lease refers to the payments here in question as rentals is not controlling. *Alice G. K. Kleberg*, *supra*.

It is our opinion that the two $50,000 payments constituted bonus payments for the following reasons: First, the lease does not indicate that these payments are for delay in drilling, whereas other payments are provided for in the lease for failure to drill; second, under the terms of the lease the $50,000 payments cannot be avoided by drilling; third, the first two payments are so much greater in amount than the sums provided for delay in drilling that they bear no relation to the harm apprehended by the parties for failure to drill. These $50,000 payments are 12 times greater than the payments specifically provided in the lease for failure to drill.

The cases of *United States* v. *Dougan*, 214 F. 2d 511 (C.A. 10, 1954), and *Olen F. Featherstone*, 22 T.C. 763 (1954), relied on by the petitioner are clearly distinguishable. The courts in both of these cases held the payments therein made deductible as rentals. Those cases involved noncompetitive leases of public lands under the Mineral Leasing Act of February 25, 1920, as amended August 8, 1946, ch. 916, sec. 3, 60 Stat. 951, 30 U.S.C. 226. The *Featherstone* case also involved leases from State governments under similar State statutes. In those cases the Commissioner contended that first-year rental payments under those leases were in the nature of bonuses and should be capitalized. However, Congress, in the Mineral Leasing Act, *supra*, had specifically termed certain payments under competitive oil leases "bonuses," while calling the sums with which the courts were concerned "rentals." Further, although the payments in some years were somewhat larger than the payments provided for other, the various annual payments were not grossly disproportionate to each other.

The second question raised by the petitioner is whether bonus payments are capital items or whether they may be deducted when paid as ordinary and necessary expenses of the business. We think that bonus payments are to be considered capital items. This Court and three Courts of Appeals have so held. *Sunray Oil Co.*, 3 T.C. 251 (1944), affd. 147 F. 2d 962 (C.A. 10, 1945), certiorari denied 325 U.S. 861 (1945); *Canadian River Gas Co.* v. *Higgins*, 151 F. 2d 954 (C.A. 2, 1945), certiorari denied 327 U.S. 793 (1946); *Baton Coal Co.* v. *Commissioner*, 51 F. 2d 469 (C.A. 3, 1931), affirming 19 B.T.A 169 (1930), certiorari denied 284 U.S. 674 (1931).

The petitioner relies on *Lambert* v. *Jefferson Lake Sulphur Company*, 236 F. 2d 542 (C.A. 5, 1956), which stated that installment pay-

ments of a bonus would be deductible and relied on *Burton-Sutton Oil Co. v. Commissioner*, 328 U.S. 25 (1946). The *Burton-Sutton* case involved annual payments to the lessor of a certain percentage of net income from the production of oil. The instant case involves the payment of a principal amount, or bonus, in the first 2 years of the lease.

Respondent's regulation section 1.612–3(a)(3) provides: "In the case of the payor, payment of the bonus constitutes a capital investment made for the acquisition of an economic interest in a mineral deposit or standing timber recoverable through the depletion allowance." Substantially the same language has been in the regulations since 1940. Congress made extensive revisions in the revenue laws in 1954 but did not make any provision which would change the effect of this language in the regulations. Therefore, we conclude that this language remains a proper statement of the law.

In any event, these bonus payments are not deductible. A payment may not be deducted solely on the grounds that it is not a capital payment. It must be shown further that the payment is an ordinary and necessary expense. *York Water Co.*, 36 T.C. 1111 (1961). In the present case the payment of the bonus resulted in a long-standing direct benefit to the petitioner.[4] This benefit was to extend into the indefinite future. Therefore, it cannot reasonably be said that the payment was an ordinary and necessary expense to be deducted in a single year. *Kauai Terminal, Ltd.*, 36 B.T.A. 893 (1937).

*Decision will be entered under Rule 50.*

---

[4] This right was indeed a valuable one. If the petitioner met her drilling obligations, the only sums she was required to pay under the lease from the Cuban Corporations were the two $50,000 payments. No royalty payments were provided for. In a 4-year period the Cuban Corporations were required to pay $100,000 to the Cuban Government with respect to the petitioner's land as rentals alone. However, neither of the parties has contended that the transaction was not a bona fide mineral lease.