W. O. Pope and Essie N. Pope v. Commissioner.
Pope v. Commissioner
Docket No. 90234.
United States Tax Court
T.C. Memo 1962-279; 1962 Tax Ct. Memo LEXIS 30; 21 T.C.M. (CCH) 1477; T.C.M. (RIA) 62279; November 26, 1962
George M. Mott, Esq., 632 Illinois Bldg., Indianapolis, *31 Ind., for the petitioners. Ferd J. Lotz, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined a deficiency in income tax of the petitioners for the taxable year 1955 in the amount of $2,698.24. The only issue presented for our consideration is whether petitioners are entitled to deduct the amount of $10,274.58 paid by petitioner W. O. Pope during 1955 on a judgment against him. Some of the facts have been stipulated and are so found. W. O. Pope and Essie N. Pope are husband and wife residing in Greenfield, Indiana. They filed their joint 1955 income tax return with the district director of internal revenue at Indianapolis, Indiana. Petitioner Essie N. Pope is involved solely by virtue of having filed a joint return, and W. O. Pope will hereinafter be referred to as petitioner. Prior to July 1, 1952, petitioner operated the Hancock Developing and Supply Company as a sole proprietorship business. On July 1, 1952, the business was duly incorporated under the laws of the State of Indiana. Between July 1950 and August 1951, petitioner purchased approximately 41 acres of land in Greenfield, Indiana, *32 for the purpose of establishing a housing project of approximately 300 houses. Shortly thereafter, an engineer was hired and eventually an acceptable plot plan was submitted to the Federal Housing Administration. The first house in this project was sold in October 1951. Eventually the proprietorship and the successor corporation built and sold 41 houses, and thereafter sold the remaining land in lots. On April 14, 1950, Corflor, Inc., was incorporated for the purpose of manufacturing pre-stressed, steel reinforced concrete beams which were called "Corflor," were formed with a hollow center about 5 inches in diameter, and were used as sub-flooring for houses. The hollow centers were designed for incorporation into a central heating system, thus furnishing both radiant and perimeter heat. The stockholders of the corporation as of December 30, 1950, were as follows: Number
Stockholder
of Shares
C. C. Irving
100
Albert Irving
100
Irving Brothers
100
Josephine Irving
80
George Nagle
20
Ardis Miller
10
W. H. Sorrell
10
Total
420
When Corflor, Inc., was incorporated, $100,000 in no par stock, computed at $100 per share, was authorized. The incorporators *33 had paid in approximately $42,000 for their stock interest and held $100,000 in purported capital notes payable of the corporation. On March 1, 1951, Albert Irving owned 100 shares of stock of Corflor, Inc., and held a purported capital note of the corporation payable to him in the amount of $21,000. The form used for this note provided in part: SIX PER CENT THREE YEAR CAPITAL NOTE … For value received, hereby promises to pay… or order, on the * * * day of * * *, 19 . (unless this capital note shall have been sooner redeemed),… Dollars in legal currency of the United States of America, and to pay interest thereon from date capital note was executed, at the rate of 6 per cent per annum, such interest to be payable annually in legal currency on the… day of… in each year. Both the principal and interest on this capital note shall be payable at the office of the Corporation. The indebtedness evidenced by this certificate will be junior in case of liquidation or insolvency of this corporation to bank indebtedness and operating indebtedness of the corporation. The right is hereby reserved to the Corporation at any time upon giving thirty (30) days' notice in writing *34 of its intention to do so, to redeem any or all of said…% Capital Note at such time outstanding by the payment of the par value thereof plus accrued interest to the date of such redemption. This capital Note is transferable only on the books of the Corporation in person or by duly authorized attorney upon surrender of this Capital Note properly endorsed. Petitioner desired to use Corflor in his houses because of its heating uses and also because it would make the houses more fireproof and would eliminate squeaking floors. Petitioner was informed on or about March 1, 1951, that Corflor, Inc., would have difficulty in furnishing Corflor to him for use in his houses. Albert Irving was managing Corflor, Inc., at that time. His uncle, C. C. Irving, felt that Albert was incapable of managing it properly but that there was no one else available to run the business. C. C. Irving therefore suggested to petitioner that if he, petitioner, would buy Albert out, then petitioner could personally manage the business and assure himself a supply of Corflor. Thereafter, on March 8, 1951, petitioner purchased from Albert Irving his 100 shares of stock of Corflor, Inc., for $10,000. At the same *35 time, petitioner gave his 90-day note to Albert Irving in the amount of $21,000, which note read as follows: $21,000.00 March 8, 1951 90 days after date I promise to pay to the order of A. R. Irving Twenty-One Thousand and 00/100 Dollars. Negotiable and payable at Lincoln National Bank, Ft. Wayne, Ind.
With interest at the rate of 6% per annum and attorney's fees. Value received. Without any relief whatever from Valuation or Appraisement Law. The drawers and endorsers severally waive presentation for payment, protest, or notice of protest, and non-payment of this note. (signed) Wm. O. Pope (ON BACK) 12-1-51 to apply on interest
$945.00
2-1-51 to apply on interest and
principal
500.00 After petitioner acquired Albert Irving's stock of Corflor, Inc., the latter ceased to be connected with the management of that corporation. Sometime thereafter, but no later than February 18, 1954, petitioner became treasurer of Corflor, Inc. On September 30, 1951, the corporation issued a purported capital note payable to petitioner in the amount of $21,000. On October 15 and November 3, 1952, petitioner purchased, respectively, 114 and 22 shares of stock of Corflor, *36 Inc. As of November 3, 1952, petitioner owned 236 shares of stock out of a total number of 470 then outstanding. During the April 1952 term of that court, Albert Irving brought suit in the Circuit Court of Hancock County, Indiana, against petitioner on the latter's note dated March 8, 1951. The suit was subsequently transferred to the Circuit Court of Madison County, Indiana, which latter court on November 13, 1952, rendered judgment in favor of Albert Irving and against petitioner in the amount of $22,907.44. During the taxable year 1955, petitioner made a final payment under the aforementioned judgment in the total amount of $10,616.36, which included interest in the amount of $341.78. After petitioner acquired his interest in Corflor, Inc., he learned that its entire operation was in an experimental stage. Nevertheless, during the period that the petitioner was engaged in the construction of the aforementioned subdivision project, he, operating as a single proprietorship and later, Hancock Developing and Supply, Inc., purchased Corflor from Corflor, Inc., for use in the project in the total amount of $32,378.76. Petitioner's housing project used Corflor in 31 of the 41 houses *37 built by him. Corflor was a satisfactory product, and its use was discontinued only because the plant of Corflor, Inc., became unable to produce any further quantities. As of March 31, 1951, Corflor, Inc.'s balance sheet was as follows: CORFLOR, INC - FORT WAYNE, INDIANA
Balance Sheet, March 31, 1951
ASSETS
CURRENT ASSETS: Cash on hand and in bank
$ 123.36
Inventories: Materials
$42,807.36
Finished goods
3,354.50
Jobs in process
2,756.55
48,918.41
Prepaid expense
1,149.90
Total Current Assets
$ 50,191.67
PROPERTY, PLANT AND EQUIPMENT: Land
$ 500.00
Building
14,029.48
Equipment
94,497.08
Total Property, Plant and Equipment
109,026.56
DEFERRED CHARGES: Organization expense
$ 133.95
Deferred operating expenses
4,267.36
Experimental expense
3,045.00
Total Deferred Charges
7,446.31
TOTAL ASSETS
$166,664.54
LIABILITIES AND CAPITAL
CURRENT LIABILITIES: Notes payable - Bank - Unsecured
$ 9,500.00
Notes payable - Stockholders and employees - Unsecured
11,900.00
Customer deposits
10,530.00
Accounts Payable: Building and equipment
$22,453.45
Trade
11,817.86
Withholding taxes
942.22
35,213.53
Accrued Expenses: Interest
$ 2,200.00
Taxes
321.01
2,521.01
Total Current Liabilities
$ 69,664.54
LONG-TERM LIABILITIES: Notes payable - Officers and stockholders - Unsecured
55,000.00
CAPITAL: Common capital stock, no par value - authorized 1,000 shares; outstanding 420
shares
42,000.00
TOTAL LIABILITIES AND CAPITAL
$166,664.54
*38 On February 18, 1954, Corflor, Inc., filed a petition in bankruptcy in the United States District Court for the Northern District of Indiana, Fort Wayne Division. The only claim filed by petitioner related to an indebtedness other than the $21,000 capital note. As of December 31, 1961, the bankruptcy proceeding was still pending, and no final distribution had been made. Petitioner deducted on his 1955 income tax return the amount of $10,616.36 paid to Albert Irving in 1955 as a business bad debt. He attached an explanation thereto which appears in the margin. [1] Respondent allowed a deduction of $341.78, representing interest, but disallowed the remaining $10,274.58. *39 Petitioner deducted the amount in question as a business bad debt pursuant to section 166(a) of the Internal Revenue Code of 1954. [2] He apparently also contends that the amount is deductible as a business expense under section 162 [3] or as a loss under section 165. [4] Respondent argues in opposition to a fourth alternative, section 166(f), [5] but that section applies only to guarantors of noncorporate obligations, and is therefore inapplicable to any obligation of Corflor, Inc. *40 Respondent disallowed the entire deduction, and therefore argues (1) that there was no bad debt, business or nonbusiness, because the "capital note" was not debt but a capital investment, (2) that the payment of Albert's judgment was not an ordinary and necessary business expense of petitioner, and (3) that no loss within the definition of section 165(c) was incurred. Basically, respondent contends that the issuance of petitioner's personal note to Albert was not necessary to petitioner's business but was a capital investment. In substance, petitioner bought Albert Irving's interest in Corflor, Inc. This interest consisted of 100 shares of stock, and the corporation's so-called capital note for $21,000. This capital note was, by its own terms, subordinated to the rights of general creditors, and was transferable only on the corporate books. Petitioner paid Albert $10,000 cash for his 100 shares of stock and gave him his personal, 90-day note for the so-called capital note. The record is unclear as to what happened to Albert's capital note of the corporation, but Albert did transfer his stock to petitioner. More than 6 months later Corflor, Inc., issued a $21,000 note to petitioner *41 which was identical in form to the one previously held by Albert. Having weighed the facts, we are unable to accept respondent's argument that petitioner "invested" in Corflor, Inc. Instead, we find that his purchase of Albert's stock and issuance of his personal note to Albert were made solely to assist in securing a supply of Corflor for the Greenfield housing project. Therefore, the assets acquired are not capital assets. Electrical Fittings Corporation, 33 T.C. 1026 (1960); McMillan Mortgage Co., 36 T.C. 924 (1961); Tulane Hardwood Lumber Co., 24 T.C. 1146 (1955). However, although petitioner's expenditures were proximately related to his business, we cannot sustain his deduction for the year 1955. If the entire transaction were but one capital investment in the corporation, the deductions would be proper when the stock and capital note became worthless, and 1955 has not been shown to be the proper year. Tulane Hardwood Lumber Co., supra. If the transaction were divisible, then petitioner purchased stock for $10,000 and gave a note for $21,000. In return for the cash, he received stock; in return for the note, he received *42 a corporate capital note in the identical amount. [6] Assuming that the capital note was worth its face when issued (and nothing to the contrary has been proven) petitioner incurred no expense or loss in 1951 - he incurred a $21,000 liability given in consideration for a $21,000 receivable. His bad debt would occur when his receivable - the capital note - became worthless, not when he happened to pay off his personal note. The fact that petitioner gave his own promissory note (rather than cash or something else of value) for the capital note, does not alter the time of occurrence of the loss or deductibility of the bad debt. Petitioner's citations of authority support the deduction of the cost of the stock in 1954 when the corporation was adjudicated bankrupt. That claim is not before us. Similarly, the deduction for the worthlessness of the capital note *43 would also appear to be available in that year which is not before us; and this is so whether the true character of said note is equity or debt, business or nonbusiness. For the sake of completeness, we add that the payment in question was not an ordinary and necessary business expense under section 162(a) for it would necessarily be used "in determining the gain or loss basis of [taxpayer's] plant, equipment, or other property" (here, the $21,000 capital note). See section 1.162-1, Income Tax Regs.; York Water Co., 36 T.C. 1111; KWTX Broadcasting Co., 31 T.C. 952, affirmed per curiam 272 F. 2d 406; Eagle Pass & Piedras Negras Bridge Co., 23 B.T.A. 1338. We hold that petitioner has not proven that the capital note of Corflor, Inc., became worthless during 1955, or that he incurred any "expense" or "loss" during that year. Decision will be entered for the respondent. Footnotes
1. W. O. Pope and Essie N. Pope Form 1040 - U.S. Individual Income Tax Return - 1955 Explanation of Bad Debt Deduction In 1951, W. O. Pope was personally engaged in developing a real estate project in Greenfield, Indiana, and constructing houses in such project. There was used in the construction of these homes precast reinforced concrete beams manufactured by Corflor, Inc. in Fort Wayne, Indiana. That corporation was in financial difficulty and, to improve its position and to insure a supply of concrete beams, Mr. Pope advanced various sums of money to it. One of the stockholders of Corflor, Inc. was Albert Irving who held $21,000 of notes of Corflor, Inc. and he was pressing for collection of these notes. To relieve the financial position of Corflor, Inc., Mr. Pope purchased Mr. Irving's stock and, in addition, he gave Mr. Irving his personal note of $21,000 and took in return the $21,000 of notes of Corflor, Inc. held by Mr. Irving. In 1952, Mr. Irving brought suit against Mr. Pope and secured a judgment against him for $21,000. Mr. Pope has been paying this judgment off at the rate of $500 per month plus interest. During the year 1955, he paid $10,616.36 against the judgment and the interest accrued thereon. In the year 1953, Corflor, Inc. was thrown into bankruptcy and is hopelessly insolvent, which means he will be unable to realize any recovery on the notes he received from that corporation. Inasmuch as this obligation was incurred by Mr. Pope in connection with his business of home construction and real estate development, the entire amount paid during the year is entirely deductible.↩
2. All further statutory references are to the Internal Revenue Code of 1954. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly Worthless Debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially Worthless Debts. - When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. ↩
3. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * * ↩
4. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. * * * ↩
5. SEC. 166. BAD DEBTS. (f) Guarantor of Certain Noncorporate Obligations. - A payment by the taxpayer (other than a corporation) in discharge of part or all of his obligation as a guarantor, endorser, or indemnitor of a noncorporate obligation the proceeds of which were used in the trade or business of the borrower shall be treated as a debt becoming worthless within such taxable year for purposes of this section (except that subsection (d) shall not apply), but only if the obligation of the borrower to the person to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) at the time of such payment.↩
6. The record does not definitely indicate whether Albert assigned his capital note to petitioner or whether it was surrendered to the corporation and a new note issued. The latter seems more likely, as it was stipulated that the corporation issued its note to petitioner more than 6 months after the transaction with Albert.↩