George A. LAMBERT and Chester A. Usry, Appellants,

v.

JEFFERSON LAKE SULPHUR COMPANY, Appellee.

UNITED STATES of America, Appellant,

v.

JEFFERSON LAKE SULPHUR COMPANY, Appellee.

No. 16008.

United States Court of Appeals Fifth Circuit.

Sept. 6, 1956.

Morton K. Rothschild, Atty., Dept. of Justice, Washington, D. C., Charles K.

Rice, Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson, Attys. Dept. of Justice, Washington, D. C., George R. Blue, U. S. Atty., Prim B. Smith, Jr., Asst. U. S. Atty., New Orleans, La., for appellants.

René H. Himel, Jr., Deutsch, Kerrigan & Stiles, New Orleans, La., Eberhard P. Deutsch, New Orleans, La., of counsel, for appellee.

Before TUTTLE, CAMERON and JONES, Circuit Judges.

CAMERON, Circuit Judge.

These appeals are from summary judgments entered by the Court below against the United States for $14,216.82 refund of income taxes for 1946, and against a District Director of Internal Revenue and his successor for $23,266.87 with interest, refunds of income taxes paid for the years 1945 and 1947, referred to hereafter as defendants (or the Government); and in favor of the taxpayer, Jefferson Lake Sulphur Company, hereinafter called plaintiff.[1] The facts, except as to amounts involved in the two civil actions are the same; the two actions were consolidated for trial by the Court below and considered as one in its written opinion.[2]

The question presented for decision below and here is whether plaintiff owner of sulphur rights under a contract with Texas Gulf Sulphur Company having many attributes of a mineral lease, was entitled, for income tax purposes, to deduct fixed rentals payable periodically during the primary term of the lease; or whether such amounts should be capitalized as leasehold costs. Defendants contended below and assert here that the amounts paid by plaintiff were not rentals, but were leasehold costs and were improperly deducted, basing their contention on the claim that the amounts grew out of the assumption by plaintiff of the liabilities imposed upon Texas Gulf Sulphur Company by its contract with Pathfinder Oil Company, its predecessor in title; and that the legal effect of said payments was fixed by the terms of that contract.

Plaintiff contends, on the other hand, that the payments deducted by it were properly deducted when judged under the terms of its own contract with Texas Gulf rather than under the terms of the contract by which Texas Gulf acquired its title from Pathfinder. The legal question involved[3] rests primarily, therefore, upon determination of the nature and quality of the obligation discharged by plaintiff when it made the payments in question.

Plaintiff acquired its rights under a contract with Texas Gulf dated October 25, 1943, defined in its terms as " * * in the nature of an option and conditional lease." This contract granted plaintiff the right to conduct preliminary exploratory operations on the land described until May 1, 1944; and the right to install plants and machinery and mine sulphur under the terms of the contract, provided it was made effective by notice of acceptance of the option. If production was commenced before October 1, 1947, the end of the primary term, the contract was to remain in force as long thereafter as production continued. If actual production had not been begun during this primary term or if production should be suspended for ninety days (under conditions spelled out in the contract), plaintiff's rights under the contract would be forfeited.

---

1. The taxes were actually paid by Jefferson Lake Sulphur Company, Inc., but that company was, on December 31, 1949, merged with and succeeded by Jefferson Lake Sulphur Company which assumed all liabilities and succeeded to all assets of the taxpayer including all rights with respect to the taxes in controversy. The term plaintiff will include either or both of these corporations as the particular facts may signify.

2. Jefferson Lake Sulphur Co. v. Lambert, D.C.E.D.La., 1955, 133 F.Supp. 197.

3. Both parties below moved for summary judgments based entirely upon one affidavit filed by plaintiff, and the judgments entered below recite that the parties agreed that no issue of fact was involved, and that only a question of law was presented.

Plaintiff conducted successful exploratory operations and gave the notice of acceptance of its option within the term provided in the contract and began commercial production of sulphur June 7, 1946. Among the obligations laid upon plaintiff in its contract of 1943 with Texas Gulf was its assumption of certain payments due by Texas Gulf under the contract made in 1937 by which it acquired the sulphur rights from Pathfinder Oil Company. Therein Texas Gulf had agreed to pay Pathfinder the sum of $7,500.00 at the beginning of each quarter during the ten year period beginning in 1937 and ending with the payment due in August, 1947. The payments coming due (to Pathfinder) after execution of its contract of October 25, 1943 were assumed by plaintiff in its contract with Texas Gulf, and it proceeded to make such payments through the one due in August, 1947, which final payment covered a period ending approximately at the same time as the primary term of the contract between Texas Gulf and plaintiff. These quarterly payments of $7,500.00 were made by plaintiff directly to Texas Gulf, which in turn remitted to Pathfinder. Plaintiff deducted each of these payments in computing its income taxes. Upon disallowance of the deductions by the Commissioner, plaintiff paid the taxes, filed claims for refund and, in due time, brought these actions for recovery of the taxes so paid, contending that the deductions were proper.

The Government, on the other hand, claims that the payments amounted to installments of a lump-sum bonus and should be "capitalized" and were, therefore, not properly deductible,[4] basing the argument upon the contention that the character and legal effect of plaintiff's payments of these installments were determined by the contract of 1937 between Texas Gulf and Pathfinder rather than the terms of the contract of 1943 between plaintiff and Texas Gulf.[5] We are of the opinion that the position of plaintiff is correct and that defendant's argument cannot be sustained. This is true because, in our opinion, the Government is fundamentally wrong in seeking to define the character and quality of plaintiff's obligation to make the payments here involved, not by the terms of plaintiff's contract with Texas Gulf, but solely by the terms of the contract of 1937 between Texas Gulf and Pathfinder.[6]

The final test in questions such as these is the nature of the taxpayer's obligation to pay and what the taxpayer acquires by the payment. That test finds its answer essentially in the dealings between plaintiff and Texas Gulf evidenced by the written contract between them. Plaintiff was thereby required to pay, in addition to the costs of its operations and all base and overriding royalties, an amount equal to the remaining quarterly payments of $7,500.00 due by Texas Gulf to Pathfinder. This obligation to pay was a contingent one,

4. Plaintiff claims that even if the payments were installments of a bonus, they were nonetheless deductible. We think plaintiff's position is sound on this point, also.

5. The Government relies chiefly on the provisions of § 29.23(m)–10(a) of Treasury Regulations 111 providing in part: "Sec. 29.23(m)–10. Depletion—Adjustments of Accounts Based on Bonus or Advanced Royalty.—(a) If a bonus in addition to royalties is received upon the grant of rights in mineral property, there shall be allowed to the payee as a depletion deduction in respect of the bonus an amount equal to that proportion of the basis for depletion as provided in section 114(b) (1) or (2) which

the amount of the bonus bears to the sum of the bonus and the royalties expected to be received. Such allowance shall be deducted from the payee's basis for depletion, and the remainder is recoverable through depletion deductions on the basis of royalties thereafter received. In the case of the payor any payment made for the acquisition of an economic interest in a mineral deposit or standing timber constitute a capital investment in the property recoverable only through the depletion allowance."

6. Defendants pay but scant attention to the terms of plaintiff's contract with Texas Gulf, but quote in their brief several pages from the contract between Texas Gulf and Pathfinder.

but it was agreed in advance that it would not exceed a certain amount. Plaintiff could escape payments under it by failing to exercise its option before May 1, 1944, by declining or omitting to erect a plant for the production of sulphur before July 1, 1947 or by failing, for ninety days, to conduct sulphur production operations once begun.

This contract did not impose upon plaintiff any obligation to pay absolutely or at all events. The linking of plaintiff's obligation to pay with the obligation due by Texas Gulf to Pathfinder was merely incidental, being related only to the mechanics of payment; and it was a convenient method of arriving at the amount of money plaintiff was due to pay Texas Gulf. What plaintiff paid, it paid to Texas Gulf; what it got in return was from Texas Gulf, not from Pathfinder with which it had no privity. The conditional "assumption" by plaintiff of Texas Gulf's obligation to Pathfinder did not transmute its contract into one with Pathfinder, nor invest its obligation to pay with the attributes or characteristics inhering in those found in the Texas Gulf-Pathfinder contract.[7]

What plaintiff got in return for these payments is made clear from its contract with Texas Gulf: it was granted six months within which to explore the lands to ascertain whether they contained sulphur deposits with the option to put the contract into full effect before May 1, 1944; it had the right thereafter to erect a plant and begin the commercial production of sulphur any time before July 1, 1947, and to continue as long as it was profitable so to do.

The dominant purpose of the contract was the commercial production of sulphur for the benefit of plaintiff and Texas Gulf. The contract was and is essentially an operating agreement, and lacks the provisions normally found in mineral leases from which some courts have determined that the lessee takes title to the minerals in place upon the execution of the contract. This dominant purpose of the contract and this essential character make the classification of plaintiff's activities and payments under it much simpler than those which have perplexed the courts in similar tax cases and have brought about so many refinements and contrarieties of construction.[8]

The decision here is made simpler also by the concessions which the Government makes.[9] The quoted statement at once restricts the issues to be decided and demonstrates the error of the Government's position. Its contention that the payments "cannot be avoided by production or by forfeiture of the lease"

7. Cf. 4 Mertens, Law of Federal Income Taxation, "Rentals", § 25.108 and 1956 Cumulative Supplement p. 67, and the authorities cited.

8. See, e. g., the remarks of Mr. Justice Frankfurter in Burton-Sutton Oil Co., Inc., v. Commissioner, 1946, 328 U.S. 25, 37 and 38, 66 S.Ct. 861, 868, 90 L.Ed. 1062, where he refers to the decision in that case as a "tortuous process" and states, "It is suggested that the Tax Court makes differentiations from case to case which to the uninitiated look suspiciously like conflicting opinions"; and adverts to "the gossamer lines that have been drawn by this Court in tax cases [resulting in distinctions] which hardly can be held in the mind longer than it takes to state them".

9. The following is taken from a supplemental memorandum filed before us:
"The Government does not contend in the case at bar that fixed rentals are non-deductible; it contends that the payments in controversy are bonuses, and not rentals, and therefore are recoverable only through depletion under paragraph (a) of Section 29.23(m)–10 of Treasury Regulations 111 * * *.
"In the present case the agreement does not refer to the payments in question as 'rentals'; the District Court correctly decided that they are not rentals and therefore are not deductible as such * * *. Since they are payable in any event and cannot be avoided by production or by forfeiture of the lease, they are bonuses and recoverable only through depletion under the above-mentioned Treasury Regulation. The District Court was in error only in failing to treat these payments as bonuses. Although bonuses are sometimes called 'advanced royalties', they are not advanced royalties in the technical sense of the term as used in paragraph (e) of Section 29.23(m)–10 of Treasury Regulations 111 * * *."

shows beyond doubt that the Government is referring to and relying on the terms of the Texas Gulf-Pathfinder contract of 1937; and is ignoring the contract between plaintiff and Texas Gulf which establishes the character and attributes of the payments which form the subject of this litigation.

The Government's contention that the payments were "bonuses and recoverable only through depletion" is, as decided by the Court below, rejected by Burton-Sutton, supra, reversing our decision of the same case, 5 Cir., 150 F.2d 621, 160 A.L.R. 961. Based upon our former decision in Quintana Petroleum Co. v. Commissioner, 5 Cir., 1944, 143 F.2d 588, we had held that a lease operator's agreement to pay a percentage of net profits constituted a consideration for the execution of the conveyance and the purchase price of a capital asset, and that a payment thereunder was not, therefore, deductible as a business expense. In reversing that holding the Supreme Court said in part:

"A decision on the category of expenditures to which these 50% disbursements belong affects both the operators who make them and the owners, lessors, vendors, grantors, however they may be classed, who receive them. If they are capital investments to one, they are capital sales to the other. If they are rents or royalties paid out to one, they are rents or royalties received by the other. * * *

" * * * We do not agree with the Government that ownership of a royalty or other economic interest in addition to the right to net profits is essential to make the pos-

sessor of a right to a share of the net profit the owner of an economic interest in the oil in place. * * *

" * * * Whether the instrument creating the rights is a lease, a sublease or an assignment has not been deemed significant from the federal tax viewpoint in determining whether or not the taxpayer had an economic interest in the oil in place. * * * Nor has the title to the oil in place been considered by this Court as decisive of the capital investment of the taxpayer in the oil. * * * Congress * * * has recognized the peculiar character of the business of extracting natural resources. Leases are a method of exploitation of the land for oil and payments under leases are 'income to the lessor, like payments of rent.' * * *

" * * * As the oil is extracted and sold that economic interest in the oil in place is reduced and the holder or owner of the interest is entitled to his equitable proportion of the depletion as rent or royalty. The operator, of course, may deduct such payments from the gross receipts." [10]

From this it is plain that the Government's criticism of the decision of the Court below holding that these payments were advance royalties is not valid and that the Court below reached the correct conclusion on the grounds assigned by it as its basis.[11] But we are also of the opinion that the payments in question were in the nature of delay rentals and were properly deducted by plaintiff in stating its net income.[12]

10. The quotation is a composite of language taken from the opinion at pages 27, 32, 33 and 35 of 328 U.S., at pages 863, 865, 866 and 867 of 66 S.Ct.

11. See 133 F.Supp. 200 and the cases there cited by Judge Wright.

12. The Internal Revenue Code of 1939, § 23(a) (1) (A), 26 U.S.C.A. § 23(a) (1) (A), permits reduction for "rentals or other payments required to be made as

a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity."

And cf. § 114(b) (4) (A) (iv) of the same Code, 26 U.S.C.A. § 114(b) (4) (A) (iv).

And see also Burnet v. Harmel, 1932, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199, reversing Harmel v. Commissioner, 5

Disregarding, as we must, the technical niceties and recondite distinctions of local law, and considering the dominant factors dealt with in plaintiff's contract, it is clear that the relationship created under it was one "resembl[ing] a manufacturing business carried on by the use of the soil";[13] that plaintiff was interested only in the extraction of sulphur from the soil, and not in the ownership of land or any interest therein; and that the payments involved here were essentially "rentals *or other payments* required to be made as a condition to the continued use or possession, for the purpose of trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity." [14] [Emphasis added.]

These conclusions are buttressed by several recent decisions construing noncompetitive government oil and gas leases [15] and certain rulings made by the Revenue Service relating thereto.[16] It is stated in Mertens Law of Federal Income Taxation, July 1956 Pamphlet, p. 67, § 24.27: "Delay Rentals—The Rev-

enue Service in Rev.Rul. 56–252, 1956 IRB–23, p. 12, indicated it will no longer litigate the issue present in U[nited] S[tates] v. Dougan [10 Cir.], 214 F.2d 511 * * * and subsequent cases, with respect to noncompetitive Government oil and gas leases. However, it will continue to hold that such payments in the case of first year 'rental' payments made by lessees of private nongovernmental oil and gas leases are capital investments in mineral property recoverable only through depletion."

 It is the nature and substance of the transaction which determines tax incidence, and we find no important difference in principle between the leases involved in those cases and the contract under consideration here. Whatever differences there are weigh definitely in favor of plaintiff.

It appearing that the judgment of the Court below was correct for the reasons given in its opinion and those herein discussed, said judgment is

Affirmed.

Cir., 1932, 56 F.2d 153; Commissioner of Internal Revenue v. Wilson, 5 Cir., 1935, 76 F.2d 766; West v. Commissioner, 5 Cir., 1945, 150 F.2d 723; and Commissioner v. Gracey, 5 Cir., 1947, 159 F.2d 324.

13. Anderson v. Helvering, 1940, 310 U.S. 404, 407–408, 60 S.Ct. 952, 954, 84 L.Ed. 1277; and West v. Commissioner, supra.

14. Burnet v. Harmel, supra; Houston Farms Development Co. v. United States, 5 Cir., 1942, 131 F.2d 577; Commissioner of Internal Revenue v. Wilson, 5 Cir., 1935, 76 F.2d 766; United States v. Dougan, 10 Cir., 1954, 214 F.2d 511; Featherstone v. Commissioner, 1954, 22 T.C. 763; and 4 Mertens Law of Federal Income Taxation, Delay Rentals, § 24.27.

15. E. g. United States v. Dougan, 10 Cir., 1954, 214 F.2d 511; Commissioner of

Internal Revenue v. Miller, 9 Cir., 1955, 227 F.2d 326; Hagood v. United States, D.C.Wyo.1956, 144 F.Supp. 782; and Featherstone v. Commissioner, 1954, 22 T.C. 763.

16. Commenting on such a ruling the Court of the Tenth Circuit stated in Dougan, supra [214 F.2d 514]: "The Bureau of Internal Revenue has held that delay rentals are deductible as in the nature of carrying charges. See G.C.M. 11197, C.B. XII–1, Page 238. On the authority of this ruling, the United States apparently concedes here that if the payments are construed to be in the nature of delay rentals they are deductible as ordinary and necessary expenses without reference to the question of the lessees' equity in the property leased."