The **SHAMROCK OIL & GAS CORPO-RATION**, Petitioner,

v.

**COMMISSIONER OF INTERNAL REV-ENUE**, Respondent.

No. 21067.

United States Court of Appeals Fifth Circuit.

June 7, 1965.

Rehearing Denied July 9, 1965.

W. M. Sutton, J. Avery Rush, Jr., Amarillo, Tex., Wright Matthews, Dallas, Tex., H. A. Berry, Amarillo, Tex., for petitioner on review, The Shamrock Oil and Gas Corp., Underwood, Wilson, Sutton, Heare & Berry, Amarillo, Tex., of counsel.

Michael Mulroney, Atty., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty.

Gen., Lee A. Jackson, Atty., Dept. of Justice, R. P. Hertzog, Chief Counsel, I.R.S., Robert B. Alexander, Jr., Atty., I.R.S., Melva M. Graney, Atty., Dept. of Justice, Washington, D. C., for petitioner.

Before HUTCHESON, Circuit Judge, WHITAKER,* Senior Judge, and RIVES, Circuit Judge.

HUTCHESON, Circuit Judge.

The petitioner here seeks reversal of two Tax Court decisions. The first determines petitioner's "gross income from the property" for the purposes of computing its depletion allowance for the fiscal years 1943 through 1954 with respect to natural gas produced by the petitioner and in which it owned an economic interest. The second concerns the tax treatment in the hands of petitioner of cash bonuses or initial payments paid by it for the original acquisition or assignment of oil and gas leases to lessors or assignors who retained an economic interest in the property involved. This second decision relates only to the fiscal years 1948 through 1954.

### Depletion Issue

Shamrock is an integrated oil company which produces and processes natural gas from leases in which it owns an economic interest. During the taxable years in question it made no substantial sales or deliveries of raw gas at the wellhead, but gathered the gas to central gasoline extraction plants and sold it after processing. The producing wells were connected to the gasoline plants through a gathering system which extended from one to 25 miles, depending upon the well's location on the reservoir.

At the gasoline plants the raw gas was run through two types of processing, absorption and fractionation. When the gas entered the plants it went first to the absorber. There the raw gas was run through a light absorption oil which took out the liquefiable hydrocarbons, leaving residue gas which constituted about 95 percent of the volume of the original raw gas. During the years in question the major portion of Shamrock's production consisted of sour gas, so designated because of its sulphur content. During the first taxable years this sour gas was sold for use in carbon black plants because the sulphur made it unsuitable for heating and light purposes. In the later years the Girbitol process was used to remove the hydrogen sulphide, or "sweeten" the gas, so that it could be sold for heating and light purposes. The residue gas was sold after it had been run through the absorption process, and in later years the Girbitol process as well.

As they left the absorber, the liquid hydrocarbons extracted from the raw gas were contained in the light absorption oil used in the process. This mixture was run through a "still" which extracted the liquid hydrocarbons from the absorption oil. The liquids were then put through a fractionation process which, through a combination of pressure and temperature control, separated the propane, butane, isobutane, pentane, isopentane, and hexanes-plus. Each liquid, because of its particular vapor pressure characteristics, was boiled off at a given temperature and pressure. This process was repeated until all of the desired liquids had been extracted. Shamrock sold the liquids at this point, after they had been run through the absorption and fractionation processes.

In its original income tax returns, Shamrock computed its percentage depletion deduction on the basis of a determination of the price of gas produced at the wellhead, through a "proportionate profits" or "work back" method. It started with the proceeds from the sale of the residue gas and the liquid hydrocarbons and subtracted from that total the following: (1) a 6% return on its investment in the processing plants, (2) plant operating expenses, and (3) gathering costs. The Commissioner disagreed in part with the method and price used by Shamrock and determined de-

* Of the United States Court of Claims, sitting by designation.

ficiencies. Shamrock's petition in the Tax Court challenged the Commissioner's determination.

The applicable regulation pertaining to depletion of oil and gas wells [Treasury Regulations 118 (1939 Code), Sec. 39.23(m)–1(e)] provides that "gross income from the property" as used in the depletion provision of the statute means:

"the amount for which the taxpayer sells the oil and gas in the immediate vicinity of the well. If the oil and gas are not sold on the property but are manufactured or converted into a refined product prior to sale, the gross income from the property shall be assumed to be equivalent to the representative market or field price (as of the date of sale) of the oil and gas before conversion or transportation."

The Tax Court held that Shamrock's "gross income from the property" was to be determined by applying the "representative market or field price" since it found that Shamrock made no significant actual sales "in the immediate vicinity of the well". It further found that there was a "representative market or field price" in the gas field in question and that it should be determined by computing a weighted average of actual prices paid at the wellhead during the years in question by purchasers of raw gas. The components of that weighted average were the prices paid by the petitioner for gas purchased from the working interests of others, the prices paid by the petitioner for casing-head gas, the prices paid for gas purchased by the petitioner under miscellaneous contracts, and the prices paid by interstate pipeline companies for raw gas delivered at the wellhead.

On appeal, Shamrock asserts nine errors pertaining to the depletion issue. These, in summary, boil down to four basic contentions: (1) the Tax Court erred in refusing to hold that Shamrock's depletion base should be calculated by the "proportionate profits" method, (2) it was error to use the "rep-

resentative market or field price" in this case because there were not a sufficient number of comparable sales of gas upon which to establish the price, (3) in the alternative, if the representative price is to be used, the Tax Court erred in excluding certain sales contracts and in including others, (4) the Tax Court erred in treating the absorption process in the gasoline plants of the taxpayer as a manufacturing activity, as opposed to holding the process was a part of production.

As to the depletion issue we are of the firm conviction that the Tax Court's exhaustive opinion, reported at 35 T.C. 979, properly disposed of all of the contentions asserted by petitioner. We accordingly adopt that opinion and affirm its decision on that issue. No good purpose would be served by restating here the complex and detailed facts which are so carefully developed in the Tax Court opinion or the many authorities upon which it relied. In addition to the Tax Court opinion in this case, an excellent discussion of the weighted average method of computing the "representative market or field price" is contained in Hugoton Production Co. v. United States, 315 F.2d 868 (Ct. of Claims 1963), which relied in part upon the Tax Court's decision in this case.

Shamrock contends quite vigorously that the Tax Court's findings and conclusions that the processing activities conducted in their gasoline plants were manufacturing activities conflict with this Court's decision in Weinert's Estate, 294 F.2d 750 (5th Cir. 1961) which was rendered some five months after the Tax Court filed its findings and opinion. We do not agree. Both Weinert's Estate and Scofield v. La Gloria Oil & Gas Co., 268 F.2d 699 (5th Cir. 1959), upon which the statement concerning the absorption process as a part of production was based, involved cycling operations in which the absorption process constituted an indispensable part of the severance of the raw gas produced. In both cases the liquid hydrocarbons were extracted from the raw gas and the dry gas remaining was injected back into the reservoir in order to maintain pressure. The

cycling plants, which contained absorption facilities, were essential for continuing production of gas from the wells. Without them, maximum recovery of the heavier hydrocarbons in the high pressure reservoirs would have been impossible because of retrograde condensation caused by reduced reservoir pressure. As the Court stated in Weinert,

"Here, the plant was not a separate manufacturing plant or business, but an indispensable part of the severance and sale of the gas and liquid hydrocarbons produced from the unitized leases."

Shamrock's facilities involved no cycling operation. Although the absorption process here may have been essential from a marketing viewpoint, it was in no sense essential to *production,* any more than it can be said that the fractionation process was essential to production. Both were designed and operated to separate the raw gas into its various component parts for marketing purposes. What Shamrock produced was raw gas. The fact that it separated this raw gas into residue gas and liquid hydrocarbons, and then separated the liquid hydrocarbons into their various components, does not mean that production ended at the termination of the processing, or at some stage during that processing. The absorption process used by Shamrock was clearly not an element of production, but was merely one of the steps in the manufacturing processes used by an integrated oil company in marketing the gas it produces. The Tax Court correctly looked to the "representative market or field price" for sales of raw gas at the wellhead, treating Shamrock as it would any other producer, without allowing it a larger depletion base just because it happens to be an integrated manufacturer as well as a producer. United States v.

Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960).

### Bonus Issue

All facts relative to the bonus issue are stipulated so that the only question here is whether or not the Tax Court correctly determined the law as to the tax treatment of bonuses in so far as the lessee-petitioner is concerned. The Tax Court held that the petitioner was required to report as gross income the full amount of its share of production income without deducting the bonuses paid to lessors. It also held that the petitioner must arrive at its depletion base for percentage depletion purposes by diminishing the amount of production income it received by the proportionate part of the bonus allocable to the production for each year.

Petitioner asserts here, as it did below, three alternative contentions. (1) It, as lessee, should be permitted to deduct or exclude the bonus payments in full from its gross income in the year they are paid. (2) If they are not deducted in full in the year paid, then a proportionate part of the bonus, based on the anticipated productive life of the lease, should be deducted from gross income. (3) If the bonuses are to be considered capital expenditures and the deduction from gross income denied, then petitioner should not be required to exclude the bonus payment from its depletion base.

Petitioner readily concedes that the decision of the Tax Court is supported by the direct holdings of no less than four Courts of Appeal, including this Court.[1] However, it contends that Burton-Sutton Oil Co. v. C. I. R., 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062 (1946) overturned this long-established tax treatment, and that this Court has so held in Lambert v. Jefferson Lake Sulphur Co., 236 F.2d 542 (5th Cir. 1956).

1. Murphy Oil Corp. v. United States, 337 F.2d 677 (8th Cir. 1964), cert. denied 85 S.Ct. 1332, April 26, 1965; Canadian River Gas Co. v. Higgins, 151 F.2d 954 (2nd Cir. 1945), cert. denied 327 U.S. 793, 66 S.Ct. 818, 90 L.Ed. 1019; Sun-

ray Oil Co. v. Commr., 147 F.2d 962 (10th Cir. 1945), cert. denied 325 U.S. 861, 65 S.Ct. 1201, 89 L.Ed. 1982; Quintana Petroleum Co. v. Commr., 143 F.2d 588 (5th Cir. 1944).

We do not agree. The issue before the Court in Burton-Sutton involved only the question of whether the possessor of a right to a percentage of the net profits from production owned an economic interest in the oil in place and was thus entitled to a depletion deduction. The tax consequences to the lessee-payor of bonus payments, which is the sole issue here, was not before the Court in Burton-Sutton and the opinion there gives no reason to believe that the holding of that case requires the overruling of long-standing Treasury Regulations and prior decisions of the Courts of Appeals pertaining to the treatment of bonus payments.

Petitioner places great weight on this Court's decision in Lambert v. Jefferson Lake Sulphur Co., supra, as supporting its contention that it should be allowed to deduct the bonus payments from its gross income, either in full when paid, or in proportionate amounts based on the anticipated productive life of the lease. That case causes some confusion because the Court not only assigned its reasons for affirmance of the district court, but also adopted the district court's conclusions on the grounds assigned by it. In such a case we can only look to the nature of the payments involved. It seems clear that they were, as this Court characterized them, "in the nature of delay rentals", 236 F.2d 542, 546, rather than bonus payments, although there is dicta to the effect that "even if the payments were installments of a bonus, they were nonetheless deductible". 236 F.2d 542, 544, note 4. Although the holding that the payments were deductible as delay rentals is sound, to the extent that the dicta may be read as providing the same treatment to bonus payments, it is specifically rejected.

The basic fault in petitioner's case is its inability to point to any provision of the Code or of the Regulations which allows the deductions here sought. The burden is on the petitioner to point to the statutory provisions or valid administrative regulations which allow the deduction. Absent such statutory provision it will not at all do to lift from myriad judicial opinions statements as to the nature of bonus payments and thereby create a deduction nowhere found in the Code itself. The real substance of petitioner's argument amounts to a contention that the present tax treatment of bonuses is unfair to lessees and should be changed.[2] This may well be a persuasive argument to the Congress where the enactment of remedial legislation could be accompanied by careful consideration of all of the complex interrelationships involved in an oil and gas lease arrangement, but legislating is not the function of this Court. As the case reaches this Court it is the taxpayer's burden to overcome the Commissioner's determination by reference to statute or regulation which supports its claim. Instead of being able to do so, as the Tax Court's opinion points out, the statute and the regulations support not the petitioner's claim, but rather, that of the Commissioner.

The Tax Court having properly disposed of all issues in the case, its decisions must be, and are hereby, affirmed.

On Motion for Leave to File Brief Amicus Curiae and

On Petition for Rehearing

PER CURIAM:

It is ordered that the motion of Vester T. Hughes, Jr. for leave to file brief amicus curiae in the above-entitled and

2. See for example, Hughes, Tax Consequences to Lessee of Bonus Paid for an Oil and Gas Lease, 11th Annual Institute on Oil & Gas Taxation 487 (S.W. Legal Foundation 1960) which is cited extensively by petitioner, Mr. Hughes' final conclusion is as follows:

"But undoubtedly the most desirable course would be corrective legislation affording to the bonus a tax treatment, from the standpoint of both lessees and lessors, which more nearly recognizes its true character, i.e., a capital payment and not an advance royalty." Id. at 518.

numbered cause be, and the same is hereby granted.

It is further ordered that the petition for rehearing filed in the above entitled and numbered cause be, and the same is hereby denied.