THE LOUISIANA LAND AND EXPLORATION COMPANY AND SUBSIDIARIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 30292-85, 37799-85,                Filed April 7, 1988.
47753-86.

*William M. Linden, Ewing Werlein, Jr., Christine L. Vaughn, John W. Leggett,* and *Elaine Drodge Koch,* for the petitioners.

*Thomas R. Ascher,* for the respondent.

WILLIAMS, *Judge*: In these consolidated cases, the Commissioner determined deficiencies in petitioners' Federal corporate income tax for the taxable years 1979, 1981, and 1982 as follows:

| Docket No. | Year | Deficiency |
|---|---|---|
| 30292-85 | 1979 | $30,693,922 |
| 37799-85 | 1981 | 29,618,171 |
| 47753-86 | 1982 | 1,130,372 |

The sole issue remaining for our decision is whether petitioners are entitled to percentage depletion pursuant to section 613[1] on income from sulphur chemically converted

---

[1] All section references are to the Internal Revenue Code of 1954 as in effect for the years in issue.

from hydrogen sulfide produced from an oil and gas well. Respondent has stipulated that if we find petitioners are entitled to percentage depletion deductions, they correctly computed the amount of the depletion deductions on their Federal income tax returns.

### FINDINGS OF FACT

Petitioners, the Louisiana Land & Exploration Co. (LL&E) and Subsidiaries, are an affiliated group of corporations whose common parent is LL&E. LL&E is a Maryland corporation having its principal office at New Orleans, Louisiana. Petitioners are calendar year, accrual method taxpayers.

During the years in issue, petitioners were engaged primarily in exploration for and development, production, refining, and sale of crude oil and natural gas and exploration for, production and mining of other minerals such as sulphur, gold, silver, copper, and coal in the United States and several foreign countries. Petitioners owned a working or operating interest in leases of oil wells in the Jay-Little Escambia Creek Field (Jay Field) in Escambia County, Alabama, and Santa Rosa and Escambia Counties, Florida. Petitioners extracted four categories of products from the Jay Field wells: liquid hydrocarbons, gaseous hydrocarbons, nonhydrocarbon gases, and nonhydrocarbon liquids.[2]

Hydrocarbons are organic compounds containing only hydrogen and carbon and are most commonly used as fuels. The liquid hydrocarbon produced from the Jay Field wells is crude oil, which consists of hydrocarbon compounds that are in a liquid phase at ambient temperature and pressure. Crude oil is processed into various types of fuels and oils, including diesel fuel and lubricating oil. The gaseous hydrocarbons, or natural gases, exist in a gaseous state at ambient temperature and pressure and consist primarily of methane, ethane, propane, and butane.

The nonhydrocarbon gases extracted from the Jay Field wells are primarily hydrogen sulfide and carbon dioxide. The

---

[2]The Jay Field wells are labeled oil wells because the contents of the wells are in a liquid state in the reservoir. Once brought to the surface, however, some of the products extracted convert to their gaseous phase.

typical well stream in the Jay Field contains approximately 8.5 percent hydrogen sulfide and 2.2 percent carbon dioxide.

Brine water, water with a high mineral content, is the nonhydrocarbon liquid extracted from the Jay Field wells. The minerals in the water are not developed for commercial use, and the brine water is reinjected into the well reservoir to maintain pressure.

When brought to the surface, all of the items in the wells are physically mixed. The gaseous effluent, or raw outflow, from the Jay Field wells is referred to as a "sour gas" stream, meaning a stream consisting of both natural gas and hydrogen sulfide with more than one grain of hydrogen sulfide per 100 standard cubic feet of the gaseous mixture.

Hydrogen sulfide and carbon dioxide are contaminants of natural gas.[3] Sour gas cannot be used as fuel; the hydrogen sulfide and carbon dioxide must first be removed. Hydrogen sulfide is a poisonous, highly corrosive gas which cannot be vented into the atmosphere in large quantities without serious deleterious effects. In addition, natural gas contaminated by hydrogen sulfide cannot be burned or transported through pipelines because its corrosive nature would damage the combustion equipment and the pipelines. Hydrogen sulfide, alone, or in combination with natural gas is also unsuitable for use as a fuel because the combustion of hydrogen sulfide produces sulphur dioxide, a toxic substance subject to control under Federal pollution standards. Sulphur dioxide is a gas with an objectionable odor and which can damage both animals and plants.

The well effluent from the Jay Field wells is treated in facilities adjacent to the wells. Hydrogen sulfide is not transported far from the well because of the hazards involved. The well effluent is initially treated in a separation system which uses gravity to separate the effluent into brine water, sour crude oil, and a sour gas stream containing natural gas, hydrogen sulfide, and carbon dioxide. The brine water is reinjected into the well.

The separated sour crude oil undergoes further treatment within the oil stabilization system, a pressurized vessel in which heat vaporizes and removes more of the dissolved

---

[3]Natural gas could be viewed as a contaminant of hydrogen sulfide which must be removed during the processing of hydrogen sulfide into elemental sulphur. See *infra.*

sour gas (i.e., hydrogen sulfide, carbon dioxide, and natural gas). The oil stabilization system also reduces the vapor pressure of the crude oil to a low enough level that it can be stored and transported in atmospheric tanks and tank trucks. After processing, the crude oil is classified as sweet rather than sour oil.

The sour gas streams from the separation system and the oil stabilization system, containing both natural gas and hydrogen sulfide, are combined and further treated in the acid gas removal system. The acid gases (hydrogen sulfide and carbon dioxide) are separated from the natural gas through an absorption process. In a vessel called a contactor, an amine solution such as sulfinal is added to the sour gas. The amine solution absorbs the hydrogen sulfide and carbon dioxide and natural gas flow out of the top of the contactor. The separated natural gas is processed further in another contactor which removes water vapor from the gas stream. The natural gas is then transported through natural gas pipelines for use by petitioner or sale to Florida Gas Transmission Co. pursuant to a long-term gas purchase contract dated November 15, 1971.

The acid gas next is separated from the amine solution and passed into a multistage Claus sulphur recovery system, where hydrogen sulfide is converted into molten elemental sulphur by controlled combustion with air. The carbon dioxide is vented to the atmosphere. The Claus system chemically converts more than 96 percent of the hydrogen sulfide into elemental sulphur. The sulphur is then condensed and stored until sold. At all relevant times, petitioner sold the sulphur it produced to Freeport Minerals Co.

The diagram on the facing page summarizes the sour production processing system used at the Jay Field Wells.

The primary products from the Jay Field wells and processing facilities have been oil and natural gas. Sulphur has been recovered from hydrogen sulfide and sold as a byproduct of the processing facilities since the facilities were placed in operation.

The basic Claus sulphur recovery process was developed in England around 1890, but did not become economically feasible until modified by work in Germany in 1937. The

SOUR PRODUCTION PROCESSING SYSTEMS DIAGRAM

first commercial plant in the United States to use the modified Claus process was placed in operation in 1944. Claus sulphur recovery plants, however, were not economically attractive investments until the value of sulphur began to rise significantly in the 1960's. By 1970, an oversupply of sulphur seriously depressed prices,[4] but the sulphur market recovered and the price of sulphur rose dramatically in the late 1970's and early 1980's.[5]

Despite dramatic increases in construction and operating costs of Claus sulphur recovery facilities since 1968, the sulphur recovery industry has continued to grow, partly because air-pollution controls mandate the recovery of sulphur from the hydrogen sulfide removed from oil and gas wells even when it may not be economically attractive to do so.

The other major source of sulphur for commercial use is the Frasch sulphur mining industry. The Frasch industry was developed in the early 20th century and uses superheated water injected into underground sulphur deposits to melt the sulphur, which is then brought to the surface through sulphur wells. Until 1982, the Frasch mining industry was the dominant source of sulphur in the world. Since that time, however, the amount of sulphur recovered from hydrogen sulfide has been greater.

There are no known limits on the percentage of hydrogen sulfide a well can contain and still remain economically viable as a source of oil and gas. Oil and gas have been extracted from wells containing a trace quantity of hydrogen sulfide and from wells containing as much as 90-percent hydrogen sulfide.

Crude oil is measured and sold by barrels. Natural gas is measured and sold by standard cubic feet. One barrel of oil has the equivalent fuel value, measured in British Thermal Units (BTU's) of 6,000 standard cubic feet of natural gas.[6]

---

[4]In 1968, sulfur sold for $42 per long ton. By 1970, the posted price of sulphur had dropped to $16 per long ton.

[5]Between 1979 and 1982, the average posted price of sulphur was approximately $100 per long ton.

[6]The BTU is a measure of the heat produced on combustion of fuel. The heat content of one barrel of oil is approximately 6 million BTU's. To produce the equivalent amount of heat from natural gas, 6,000 standard cubic feet must be burned.

Petitioners claimed percentage depletion on sulphur during the years in issue in the following amounts:

| Year | Percentage depletion deductions |
|------|-----------|
| 1979 | $878,149 |
| 1981 | 1,712,277 |
| 1982 | 978,302 |

Respondent issued his notices of deficiency and petitioners timely filed petitions on the following dates:

| Year | Docket No. | Deficiency notice issued | Petition filed |
|------|-----------|-----------|-----------|
| 1979 | 30292-85 | 5/15/85 | 8/7/85 |
| 1981 | 37799-85 | 7/15/85 | 10/10/85 |
| 1982 | 47753-86 | 9/24/86 | 12/19/86 |

If we find that petitioners' sulphur production is eligible for depletion under section 613(b), respondent concedes that petitioners are entitled to the percentage depletion deductions claimed.

## OPINION

Section 611(a) allows as a deduction in computing taxable income from natural resources a reasonable allowance for depletion. Depletion generally is calculated based on the cost of the property. Sec. 612. Section 613,[7] however,

---

[7]Sec. 613 provides, in relevant part:

SEC. 613. PERCENTAGE DEPLETION.

(a) GENERAL RULE.—In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance, for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). For purposes of the preceding sentence, the allowable deductions taken into account with respect to expenses of mining in computing the taxable income from the property shall be decreased by an amount equal to so much of any gain which (1) is treated under section 1245 (relating to gain from disposition of certain depreciable property) as ordinary income, and (2) is properly allocable to the property. In no case shall the allowance for depletion under section 611 be less than it would be if computed without reference to this section.

(b) PERCENTAGE DEPLETION RATES.—The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows:

(1) 22 PERCENT—

(A) sulphur and uranium; and

\*       \*       \*       \*       \*       \*       \*

(7) 14 PERCENT—all other minerals \* \* \* For purposes of this paragraph, the term "all other minerals" does not include—

(A) soil, sod, dirt, turf, water, or mosses;

provides an allowance for depletion for certain mines, wells, and other natural deposits based on a specified percentage of the gross income from the property less any rents or royalties paid or incurred in respect of the property. Percentage depletion for natural resources has been a part of the Internal Revenue Code since the Revenue Act of 1926. Pub. L. 69-20, sec. 204(c)(2), 44 Stat. 16. The percentage depletion rate for sulphur is 22 percent. Sec. 613(b)(1)(A).

Prior to 1975, section 613 allowed percentage depletion for oil and gas wells. The Tax Reduction Act of 1975, Pub. L. 94-12, sec. 501, 89 Stat. 47, however, amended section 613 and added a new section 613A[8] so that oil and gas no

---

(B) minerals from sea water, the air, or similar inexhaustible sources or

(C) oil and gas wells.

For the purposes of this subsection, minerals (other than sodium chloride) extracted from brines pumped from a saline perennial lake within the United States shall not be considered minerals from an inexhaustible source.

\*       \*       \*       \*       \*       \*       \*

(d) DENIAL OF PERCENTAGE DEPLETION IN CASE OF OIL AND GAS WELLS.—Except as provided in Section 613A, in the case of any oil or gas well, the allowance for depletion shall be computed without reference to this section.

[8]SEC. 613A. LIMITATIONS ON PERCENTAGE DEPLETION IN CASE OF OIL AND GAS WELLS.

(a) GENERAL RULE.—Except as otherwise provided in this section, the allowance for depletion under section 611 with respect to any oil or gas well shall be computed without regard to section 613.

(b) EXEMPTION FOR CERTAIN DOMESTIC GAS WELLS.—

(1) IN GENERAL.—The allowance for depletion under section 611 shall be computed in accordance with section 613 with respect to—

(A) regulated natural gas, and

(B) natural gas sold under a fixed contract,

and 22 percent shall be deemed to be specified in subsection (b) of section 613 for purposes of subsection (a) of that section.

(2) NATURAL GAS FROM GEOPRESSURED BRINE.—The allowance for depletion under section 611 shall be computed in accordance with section 613 with respect to any qualified natural gas from geopressured brine, and 10 percent shall be deemed to be specified in subsection (b) of section 613 for purposes of subsection (a) of such section.

\*       \*       \*       \*       \*       \*       \*

(c) EXEMPTION FOR INDEPENDENT PRODUCERS AND ROYALTY OWNERS.—

(1) IN GENERAL.—Except as provided in subsection (d), the allowance for depletion under section 611 shall be computed in accordance with section 613 with respect to—

(A) so much of the taxpayer's average daily production of domestic crude oil as does not exceed the taxpayer's depletable oil quantity; and

(B) so much of the taxpayer's average daily production of domestic natural gas as does not exceed the taxpayer's depletable natural gas quantity;

and the applicable percentage (determined in accordance with the table contained in paragraph (5)) shall be deemed to be specified in subsection (b) of section 613 for purposes of subsection (a) of that section.

\*       \*       \*       \*       \*       \*       \*

longer qualified for percentage depletion pursuant to section 613. Pursuant to section 613A, oil and gas wells qualify for percentage depletion in narrowly limited circumstances.

Section 613A was the product of congressional concerns about the nation's increasing dependence on foreign oil and large profits the major integrated oil companies were reaping. The goal of the legislation was to continue to provide the tax incentive of percentage depletion to small producers and royalty owners to encourage exploration for and exploitation of domestic oil and gas reserves while eliminating such tax incentives for the major integrated oil companies. *Commissioner v. Engle*, 464 U.S. 206, 218 (1984). In general, while cost depletion continued to be available, section 613A eliminated percentage depletion for gross income from oil and gas for major integrated oil companies.

We must decide whether section 613A eliminates the section 613 percentage depletion rate on sulphur when hydrogen sulfide is produced from an oil and gas well and subsequently converted into elemental sulphur. Petitioners contend that section 613A applies only to hydrocarbon fuels and that sulphur, which is not a hydrocarbon, is depletable under section 613(b)(1). Respondent argues that the amendments to section 613 were intended to eliminate percentage depletion not only for oil and gas but also for all other minerals produced from oil and gas wells except as provided in section 613A. Specifically, "natural gas" subject to section 613A is defined to include "any product (other than crude oil) of an oil or gas well" if the product is eligible for depletion. Sec. 613A(e)(2). Respondent thus argues that because the sulphur in issue is a product of oil and gas wells, it loses its section 613 depletion allowance. Moreover, because petitioners do not qualify for percentage depletion under the exemptions set forth in section 613A(b) and section 613A(c), the sulphur is also not eligible for percentage depletion under section 613A.

---

(e) DEFINITIONS.—For purposes of this section—

(1) CRUDE OIL.—The term "crude oil" includes a natural gas liquid recovered from a gas well in lease separators or field facilities.

(2) NATURAL GAS.—The term "natural gas" means any product (other than crude oil) of an oil or gas well if a deduction for depletion is allowable under section 611 with respect to such product.

Because the rules of section 613A work on the foundation of section 613, we look first to the plain language of section 613. Section 613(b) in general provides the list of minerals that are eligible for percentage depletion and specifies the percentage depletion rates. Section 613(b)(1)(A) provides that sulphur is depletable at a 22-percent rate. Section 613(b)(7) provides for percentage depletion at 14 percent for "all other minerals" except:

(A) soil, sod, dirt, turf, water, or mosses;
(B) minerals from sea water, the air, or similar inexhaustible sources or
(C) oil and gas wells.

Because petitioners' sulphur was not extracted from a mine but from hydrogen sulfide produced from oil and gas wells, respondent argues that the income from the sulphur is depletable, if at all, pursuant to section 613(b)(7) as an "other mineral." Because of the exception of subparagraph (C) and the restriction of subsection (d),[9] respondent argues that this sulphur is not depletable under section 613. Section 613(b)(7), however, does not appear to exclude from percentage depletion under section 613 all minerals from oil and gas wells. Only subparagraph (B) includes the words "minerals from." Subparagraph (C), which states the oil and gas well exception from depletion, states simply "oil and gas wells." Specifically, subparagraph (C) does not state "minerals from oil and gas wells."

It appears that the absence of the phrase "minerals from" from paragraph (C) was not an oversight. Sulphur is not depletable under section 613(b)(7) because depletion for sulphur is expressly provided for in subsection (b)(1). Section 613(b)(7) is a catch-all provision for minerals not mentioned elsewhere in the subsection. Sec. 1.613-2(b)(4), Income Tax Regs.[10] Section 613(b)(1)(A), which provides for percentage depletion at a rate of 22 percent for sulphur, has no limitation based on the source of the sulphur. Thus, respondent's proposed statutory construction, which assumes an inadvertent failure by Congress to draft the right language, cannot be harmonized with the provision for depleting sulphur pursuant to section 613(b)(1). Sulphur is

---

[9]Sec. 613(d) provides that except as provided in sec. 613A, percentage depletion for oil and gas wells is computed without reference to sec. 613.

[10]See also Rev. Rul. 82-17, 1982-1 C.B. 95.

depletable pursuant to section 613(b)(1) and not section 613(b)(7).

Respondent further argues that Congress would not have used the term "oil and gas *wells*" as opposed to simply "oil and gas" if it had not intended to limit percentage depletion for all products of oil and gas wells. He notes that the "oil and gas well" language has been in the Code since percentage depletion was enacted in 1926 and argues that Congress would have changed it if it intended only to limit oil and gas depletion.

It is true that the statutory language on its face is incongruous. An "oil and gas well" is not itself a mineral, and to provide a depletion rate for "all other minerals except * * * oil and gas wells" would seem to require an implied reading that "minerals from" must have been intended. This implication, however, is improper given the historical application of the term "oil and gas well" in the depletion provisions to mean simply "oil and gas." The Supreme Court has interpreted "oil and gas wells" to mean the oil and gas produced from such wells. In *Herring v. Commissioner*, 293 U.S. 322, 328 (1934), the Court held that the taxpayers were entitled to percentage depletion on bonuses received as advance payments for oil and gas to be extracted even though the well was not yet in operation, reasoning that the right to depletion was not conditioned on the existence of a well.[11]

In 1984, the Supreme Court considered the effect of section 613A on percentage depletion of oil and gas income and concluded that sections 611-613A permit an allowance for percentage depletion on lease bonuses at some point during the productive life of the lease, regardless of when actual production of oil and gas occurred. *Commissioner v. Engle*, 464 U.S. 206 (1984). Although it did not expressly hold that "oil and gas wells" means "oil and gas," the Court referred repeatedly to oil and gas production, not the production of minerals from oil and gas wells.

Petitioners contend that section 613 and section 613A are mutually exclusive and thus whatever is depletable under

---

[11]We note that when the Supreme Court decided *Herring*, the Claus sulphur recovery process was not yet in commercial use and oil and gas were the only commercially viable products of oil and gas wells.

section 613 is not depletable under section 613A. Respondent argues that the two provisions are interdependent in that section 613A(e)(2) defines natural gas in terms of products depletable under section 611 and section 613, and in enacting section 613A and amending section 613, Congress intended to transfer percentage depletion for all products of oil and gas wells to section 613A. After considering the language, structure and legislative record of the passage of section 613A, we do not believe that section 613A was intended to limit sulphur depletion pursuant to section 613(b)(1).

Section 613A bars percentage depletion for oil and gas wells with two exceptions. First, percentage depletion is permitted with respect to certain domestic gas wells for regulated natural gas, natural gas sold under a fixed contract, and natural gas from geopressured brine. Sec. 613A(b). Second, percentage depletion is permitted for so much of a taxpayer's "average daily production" of domestic crude oil or natural gas as does not exceed the taxpayer's "depletable oil quantity" or "depletable natural gas quantity." Sec. 613A(c)(1). The depletable oil quantity is measured in barrels. Sec. 613A(c)(3). The taxpayer may elect to convert part of his oil quantity into a depletable natural gas quantity, based on a conversion ratio of 6,000 cubic feet of gas to one barrel of oil. Sec. 613(A)(c)(4). The conversion ratio represents a *fuel* equivalence; 6,000 cubic feet of natural gas generates the same amount of heat as one barrel of oil.

Section 613A(e) defines crude oil and natural gas for purposes of section 613A. Section 613A(e)(1) defines "crude oil" as including "a natural gas liquid recovered from a gas well in lease separators or field facilities." Subsection (e)(2) defines "natural gas" as "any product (other than crude oil) of an oil or gas well if a deduction for depletion is allowable under section 611 with respect to such product." Petitioner argues that the definition of "natural gas" in section 613A(e)(2) is intended only to distinguish between hydrocarbon natural gases and crude oil. Respondent interprets section 613A(e) as follows: Section 613A(e)(2) provides a definition; it is not an allowance section. When section 613A(e)(2) is read in conjunction with sections 611 and 613,

together they function as a filter to exclude depletion allowances for anything produced from an oil and gas well except as permitted by section 613A(b) and section 613A(c). Respondent further submits that Congress did not need to define "crude oil" because crude oil and brine water are the only minerals in liquid form extracted from oil and gas wells and are readily distinguishable. Natural gas, in contrast, is a broad concept encompassing many types of gases and is, therefore, more difficult to define. For this reason, Congress chose to define natural gas by reference to what gases are depletable pursuant to section 611. On this reasoning, respondent concludes that "natural gas" within the meaning of section 613A includes all gases produced from an oil and gas well because all such gases are depletable under section 611.

Following respondent's reasoning, "natural gas" for purposes of section 613A means any product extracted from an oil and gas well in a gaseous state. This definition encompasses both hydrocarbon and nonhydrocarbon gases. Respondent thus concludes that if hydrogen sulfide, from which sulphur is derived, is produced from an oil or gas well, it is depletable, if at all, only under section 613A. The exemptions from the general rule of section 613A(a) denying percentage depletion for oil and gas wells, however, function only when applied to hydrocarbon fuels.

Section 613A(c) provides limited percentage depletion for independent producers and royalty owners based on a depletable oil quantity of 1,000 barrels per day. Sec. 613A(c)(3). The "depletable natural gas quantity" is whatever portion of its depletable oil quantity the taxpayer chooses to convert to natural gas at a conversion ratio of 6,000 cubic feet of gas to one barrel of oil. Sec. 613A(c)(4). Congress chose 6,000 to one as the conversion ratio because one barrel of oil has the equivalent heating value of 6,000 cubic feet of "natural gas." Cf. 121 Cong. Rec. 6903 (1975) (statement of Senator Bentsen). If gases that are never used as fuels, such as hydrogen sulfide, were considered natural gases for purposes of section 613A(c), the conversion ratio would be nonsensical.

Section 613A(b), providing percentage depletion for "regulated natural gas" and "natural gas sold under a fixed

contract" also makes sense only if section 613A applies solely to hydrocarbon fuels. Regulated natural gas is gas regulated by the Federal Power Commission, which regulates only the price of fuels. The practice in the oil and gas industry when section 613A was enacted was to sell hydrocarbon gas for use as fuel under long-term fixed price contracts. Hydrogen sulfide is never used as a fuel and is not sold under long-term fixed price contracts. Its price is not regulated by the Federal Power Commission.

These apparent anomalies are reconciled, in respondent's view, by attributing to Congress an unexpressed intent to deny any percentage depletion for nonhydrocarbon gases. Under respondent's reading of section 613A(e)(2), section 613A provides exemptions for hydrocarbons extracted by independent producers and royalty owners but eliminates percentage depletion of nonhydrocarbon "natural gases" extracted from oil and gas wells for all taxpayers.

Respondent's view may be a valid literal reading of section 613A(e)(2). A literal reading, however, aims the statutory restrictions on percentage depletion at any mineral produced along with oil or gas when the legislative record of section 613A's passage is wholly devoid of mentioning any such important targets. Moreover, the legislative record tends to show that Congress believed it was not restricting percentage depletion under section 613 for any minerals except oil and gas.

Although there is scant legislative history on section 613A, the legislative record available leaves little doubt that section 613A was meant to apply only to hydrocarbon fuels. Representative William Green introduced an amendment to repeal percentage depletion for oil and gas during the floor debates in the House but the Senate Finance Committee deleted the provision. 121 Cong. Rec. 4638 (1975); S. Rept. 94-36, 94th Cong., 1st Sess. (1975). As a result of floor amendments by Senators Kennedy, Hollings, Bentsen, and others, however, the final bill included a provision eliminating percentage depletion for oil and gas wells with certain exceptions primarily for the benefit of small producers and royalty owners. See 121 Cong. Rec. 7770-7773, 7813 (1975).

The floor debates are replete with references to what some members believed to be huge profits enjoyed by the

major integrated oil companies and a concomitant lack of need for percentage depletion for oil and gas income. E.g., 121 Cong. Rec. 4611 (1975) (remarks of Representative Green); 121 Cong. Rec. 7239 (remarks of Senator Hollings). Congress also was concerned, however, with the shortage of hydrocarbon fuels and the need to encourage domestic exploration for and exploitation of new sources of fuel. Congress thus retained percentage depletion for small, independent producers to encourage domestic production. During the House debates, Representative Rhodes noted "that one of the reasons for this bill being brought here with some haste is the fact that we have a shortage of domestic petroleum." 121 Cong. Rec. 4606 (1975). In the Senate, Senator Dole remarked that "The 2,000 barrel * * * exemption from the depletion allowance repeal is vitally important to maintaining a high level of energy exploration and production," 121 Cong. Rec. 8128, and Senator Curtis added, "Our first objective should be the production of more gas and oil." 121 Cong. Rec. 7807.

Sulphur is mentioned once in the congressional debates— as part of a list of 108 mineral extractive industries for which percentage depletion was retained. 121 Cong. Rec. 7295-7296 (1975). A number of members criticized the provision for unfairly singling out the oil and gas industry. See 121 Cong. Rec. 7801 (remarks of Senator Bartlett) (criticizing amendment for altering percentage depletion only for oil and gas industry); 121 Cong. Rec. 4625 (remarks of Representative Pickle) ("if we are going to repeal the depletion allowance in one area, * * * we need to look at the depletion allowance on these other minerals"). Senator Mansfield agreed that the bill limited the depletion allowance "for the oil and gas industry while it retains it for almost every other mineral-extractive industry, for * * * 108 items which are covered by the depletion allowance." 121 Cong. Rec. 7295. He added, however, "we are now talking about one—petroleum—which is the most important of all energy items at this time." 121 Cong. Rec. 7295. Senator Hollings, a cosponsor of the amendment, added that "not one of those minerals [for which the depletion allowance was retained] has had a four-fold increase in

price" as oil and natural gas had in the early 1970's. 121 Cong. Rec. 7295.

This uncontradicted and consistent legislative record, therefore, reveals that Congress was concerned only with oil and gas when it approved section 613A. There is no indication that Congress intended to limit percentage depletion for any products of oil and gas wells other than hydrocarbon fuels.[12]

Moreover, respondent's reading of section 613A could discourage oil and gas production by independent producers and royalty owners, which would be contrary to congressional intent. Small producers must also separate hydrogen sulfide from natural gas before the natural gas may be transported through pipelines and used as fuel. If independent producers cannot claim percentage depletion for the sulphur they may recover from hydrogen sulfide before selling the hydrocarbon fuels extracted from an oil and gas well, there is less economic incentive to explore for and exploit new wells, particularly sour gas wells. Congress' goal of encouraging domestic production would in that event be thwarted. Congress did not intend to take any tax benefit away from independent producers in approving section 613A. The goal of the legislation was to eliminate what was perceived to be an unneeded tax incentive only for the major integrated oil companies.

Of course, hydrogen sulfide is a gas naturally occurring in exhaustible deposits in the earth and falls within a technical classification of "natural gases." Nevertheless, respondent himself has articulated his belief that the "natural gas" referred to in section 613A is "hydrocarbon gas." See Rev. Rul. 82-17, 1982-1 C.B. 95. Respondent's position in this case thus seems to conflict with his reading of section 613A as expressed in one of his published rulings. In Rev. Rul. 82-17, 1982-1 C.B. 95, respondent considered whether car-

---

[12]The Supreme Court, in *Commissioner v. Engle*, 464 U.S. 206, 211 (1984), has summarized the economic conditions that led to the enactment of section 613A as follows:

"The 1970's * * * brought about an abrupt redirection in the Nation's energy policy. Escalating energy prices and the Arab oil embargo awakened the public to the Nation's growing reliance on foreign energy resources. Some thought the major integrated oil companies were reaping excessive oil and gas profits at the public's expense, while reinvesting little of their concomitant tax depletion subsidies in domestic energy production. Congress responded to this public outcry by repealing the percentage depletion allowance as applied to the major integrated oil companies. "

bon dioxide extracted from a carbon dioxide well for injection into oil fields as a drive mechanism for the recovery of oil is eligible for depletion pursuant to section 613 or section 613A. Respondent articulated the applicable principles as follows:

> Although in the physical sense [carbon dioxide] is a gas, it is not the gas referred to in the term "oil and gas wells" in sections 263(c), 611, 613, and 613A of the Code. *The gas referred to in these sections is hydrocarbon gas.* The [carbon dioxide] is an exhaustible natural deposit but is not specifically referred to in any of the categories named in paragraphs 613(b)(1) through (6). Thus, it falls in the category of all other minerals described in section 613(b)(7) and is eligible for percentage depletion at the rate of 14 percent. Section 613A does not deny percentage depletion for [carbon dioxide]. [Emphasis supplied.]

While this revenue ruling does not squarely set forth respondent's position on the facts of this case because in the ruling the carbon dioxide was not produced from an oil and gas well, the ruling directly states respondent's reading of section 613A as applying only to hydrocarbon fuels and of section 613(b)(7) as applying only to minerals not expressly provided for elsewhere in subsection (b).

Finally, respondent's interpretation of section 613A conflicts with normal usage of the term "natural gas" as meaning fuel. Webster's Third New International Dictionary 1507 (1981) defines natural gas in terms of its value as a fuel:

> any of various combustible gas mixtures that when in the dry state contain largely methane and in the wet state in association with petroleum contain also higher hydrocarbons and that are used chiefly as fuels * * *

Section 613A seems also to use the term to mean a fuel, especially as applied in conjunction with Congress' goal of promoting domestic oil and gas production by subsidizing independent producers and royalty owners. *Commissioner v. Engle*, 464 U.S. at 218. Respondent's position, although technically viable, is supported neither by legislative history nor by common usage of the term "natural gas." When a literal reading of a statute conflicts with expressed congressional intent and common usage, we will reject it. *United States v. American Trucking Association*, 310 U.S. 534, 543 (1940). We conclude that in drafting section 613A, Congress

intended to limit percentage depletion only for income from hydrocarbon fuels.

Respondent raises a final argument for the first time on brief that sulphur derived from hydrogen sulfide cannot be depletable pursuant to section 613 because it is not possible to calculate "gross income from the property" with respect to the sulphur as section 613(c) requires. In the case of oil and gas wells, "gross income from the property" has been interpreted to mean gross income from the sale of the property at the "well-mouth," i.e., before conversion or transportation. Sec. 1.613-3(a), Income Tax Regs.; *Shamrock Oil & Gas Corp. v. Commissioner*, 35 T.C. 979 (1961), affd. 346 F.2d 377 (5th Cir. 1965), cert. denied 382 U.S. 892 (1965). Respondent argues that hydrogen sulfide has no commercial value before it is converted into elemental sulphur and that it is not possible to compute gross income from sulphur at the well-mouth because sulphur has not been produced at that point. Respondent thus concludes that we should not allow percentage depletion for sulphur derived from hydrogen sulfide.

Respondent, however, has entered into a stipulation of facts with petitioner pursuant to which he agreed as follows:

Petitioner[s] claimed percentage depletion deductions on sulphur in [their] tax returns in the following amounts:

| Year | Percentage depletion deductions |
|------|---------------------------------|
| 1979 | $878,149 |
| 1981 | 1,712,277 |
| 1982 | 978,302 |

If Petitioner[s'] sulphur production is subject to depletion under section 613(b) of the Code, Petitioner[s] [are] entitled to the sulphur percentage depletion deductions listed above.

The terms of stipulations are generally binding on the parties and the Court will not allow a party to ignore a stipulation except "where justice requires." Rule 91(e), Tax Court Rules of Practice and Procedure. Although this Court will disregard a stipulation that is plainly contrary to the facts (*Jasionowski v. Commissioner*, 66 T.C. 312, 318 (1976)), the evidence in this case does not justify our ignoring the parties' stipulation.

Respondent entered into the stipulation with full knowledge of the relevant facts and in doing so agreed to waive any argument concerning the amount of any depletion deduction allowable. See *United States v. 3,788.16 Acres of Land*, 439 F.2d 291, 294 (8th Cir. 1971). Raising this argument for the first time in his post-trial brief, respondent would argue a case that petitioners were unable to develop for trial and would, consequently, prejudice petitioners' case. Petitioners rightly assumed that the issue was settled and cannot now justly be required to prove the amount of the depletion deduction to which we have found they are entitled. Respondent's stipulation also suggests that the amount of the depletion deduction *is* susceptible of calculation.

We, therefore, hold that pursuant to section 613(b), petitioners are entitled to percentage depletion deductions in the amounts stipulated for sulphur produced from oil and gas wells. We further conclude that section 613A applies only to hydrocarbon fuels produced from oil and gas wells and does not affect eligibility for percentage depletion for other minerals produced from oil and gas wells.

To reflect concessions,

*Decisions will be entered under Rule 155.*